949 A.2d 761

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND
CROSS–RESPONDENT, v. RYAN BUDA, DEFENDANT–
RESPONDENT AND CROSS–APPELLANT.

Argued February 5, 2008—Decided June 23, 2008.

282

*Samuel J. Marzarella*, Senior Assistant Prosecutor, argued the cause for appellant and cross-respondent (*Marlene Lynch Ford*, Ocean County Prosecutor, attorney; *Mr. Marzarella* and *Roberta DiBiase*, Assistant Prosecutor, on the briefs).

*Jean M. Hartmann*, Designated Counsel, argued the cause for respondent and cross-appellant (*Yvonne Smith Segars*, Public Defender, attorney).

*Robert E. Bonpietro*, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Anne Milgram*, Attorney General, attorney).

*Leslie A. Stolbof Sinemus*, argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Ms. Sinemus*, attorney; *Gina Mendola Longarzo*, on the brief).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal, and three additional cases also decided today,[1] require that we address and apply the holding of the Supreme Court of the United States in *Crawford v. Washington*, 541 *U.S.*

---

[1] They are the consolidated opinion in *State v. Sweet* and *State v. Dorman*, 195 *N.J.* 357, 949 *A.2d* 809, 2008 *WL* 2484586 (2008) (addressing the admissibility of a Breathalyzer® ampoule testing certificate and a testing instrument inspection certificate, respectively), and *State in the Interest of J.A.*, 195 *N.J.* 324, 949 *A.2d* 790, 2008 *WL* 2486748 (2008) (addressing whether hearsay statements are nontestimonial, and thus admissible, as having been provided "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 *U.S.* 813, 822, 126 *S.Ct.* 2266, 2273, 165 *L.Ed.2d* 224, 237 (2006)).

36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), that, under the Confrontation Clause of the Sixth Amendment, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59, 124 *S.Ct.* at 1369, 158 *L.Ed.*2d at 197.

Specifically, this appeal requires that we determine whether two separate hearsay statements made by a severely beaten three-year-old boy—one to his mother that "Daddy beat me[,]" and a later one to a representative of the Division of Youth and Family Services (DYFS) that "Dad says nobody beat me. I fell when I was sleeping in my room."—are "testimonial" within the meaning of *Crawford* and, hence, cannot be admitted without the child/declarant testifying at and being subjected to cross-examination during trial.

We conclude, as the Appellate Division did, that the trial court did not abuse its discretion in determining that the child's statements to his mother and the DYFS worker were properly admitted into evidence as "excited utterances" under *N.J.R.E.* 803(c)(2). We also conclude that, in the circumstances presented, the child's separate statements to his mother and to the DYFS worker were not testimonial and, hence, their admission at trial did not run afoul of the Confrontation Clause.

I.

A.

In November 1998, while still a teenager living with her parents, Christine gave birth to a son, N.M.[2] Christine and her son remained with Christine's parents until 2002, when she began a serious romantic relationship with defendant Ryan Buda. As that relationship blossomed, Christine and N.M., by then three years

[2] For privacy reasons, the use of surnames—save for defendant's—is avoided, and the child/victim is referred to solely by his initials.

old, moved into defendant's home. At that time, defendant insisted that N.M. call defendant "Dad" or "Daddy." In early July 2002, shortly after the move and during a morning drive to her parents' home, where Christine's sister served as N.M.'s babysitter while Christine worked, N.M. blurted out from the back seat that "Daddy beat me." Christine asked N.M. when that had happened and he replied: "the nighttime." Later that day, Christine's mother telephoned Christine at work and told her that N.M. had an injury to his buttocks; Christine's mother thought the injury to N.M.'s buttocks looked like a handprint. Christine's mother and sister took photographs of N.M.'s bruises.

That evening, Christine asked defendant about N.M.'s bruises. According to defendant, N.M. had fallen in the bathtub and that fall caused the bruises. Christine accepted defendant's explanation.

Approximately two months later, Christine returned home from work and defendant informed her that N.M. again had fallen getting out of the bathtub and had bruised his head. Christine again accepted that explanation. The next day, Christine's father—N.M.'s grandfather—noticed the bruises and photographed them. When Christine arrived at her parents' home to pick up N.M., she and her parents argued: they asserted that defendant was beating N.M., while Christine refused to credit her parents' accusations. Christine's parents refused to return N.M. to Christine for several days, a demand to which Christine acquiesced.

On October 16, 2002, Christine again took N.M. to her parents' house to be babysat while Christine worked. Later that day, Christine's father brought N.M. to Christine's sister's home, to be babysat for the remainder of the day. Their routine was disrupted in another respect: instead of Christine picking up N.M., it was defendant who went to pick up N.M. and bring him home. When N.M. saw that defendant, and not his mother, was the person picking him up, N.M. became upset and started crying. Defendant and Christine's sister began yelling at each other, and Christine's sister accused defendant of being a child abuser.

Eventually the police were called and, after a telephone call to Christine, defendant took N.M. home, but only after the police physically had to carry him out of the house against his will and place him into defendant's car.

Two days later, on October 18, 2002, Christine varied her routine. Instead of delivering N.M. to either her parents or her sister for babysitting while she worked, she left N.M. in defendant's care. When she returned home from work, she entered a darkened living room, lit only by a television set N.M. was watching; defendant was in the house, nearby. About an hour later, she checked on N.M. more closely and noticed "a big red mark on the back of [N.M.'s] neck." Christine "started panicking" and "yell[ed]" that "[w]e got to go to the hospital." Christine and defendant rushed N.M. to the local community medical center's emergency room, where he was immediately seen. While N.M. was being examined, Christine repeatedly asked defendant what had happened, and defendant responded that "[h]e had no clue what happened to [N.M.]" and that N.M. "must have fallen."

Because the medical professionals assessing N.M. concluded that N.M. exhibited signs of abuse, they contacted DYFS's Office of Child Abuse Control, and a member of its Special Response Unit, Miriam Nurudeen, promptly responded. After speaking with an investigator from the County Prosecutor's Office who, also having responded to a call, was already at the hospital, as well as the examining physician, Nurudeen interviewed N.M. Upon entering the room where N.M. was being examined in his grandparents' presence, she observed that N.M. was "very upset" and "was crying[,]" telling his grandparents that "they had to take care of him now, and he wants to go home with them." Nurudeen also observed N.M.'s bruises. After coaxing the grandparents to leave the room, Nurudeen interviewed N.M. alone. When asked what had happened, N.M. responded that "I fell down in my room. I want to go home to grandma." Nurudeen then "asked him if anybody beat him." N.M. replied: "Dad says nobody beat me. I fell when I was sleeping in my room." She explained that when "I

tried to talk to him after that, [ ] he didn't want to answer anymore questions. And I didn't want to put anything in his mouth, so I stopped the interview."

Once N.M. was assessed, he was transferred via ambulance to Jersey Shore University Medical Center, where he remained hospitalized for two weeks due to the extent of his injuries and the internal bleeding resulting from them.

Dr. Steven Kairys, the Medical Center's Chairman of Pediatrics and the Director of the Child Protection Center, described N.M.'s condition shortly after his admission to the Medical Center as follows:

When I saw [N.M.] the day after admission, he had extensive injuries primarily to the head, the scalp, the eyes, the ears, the back of the neck. That's where really most of the injuries were. There was a combination of extensive bruising that [ ] covered large parts of his neck and scalp. Both eyes were bruised [and] were beginning to show what's called raccoon eyes, bleeding blood around the eyes. Both ears were swollen red. There was bruising both in the earlobes, themselves, as well as behind the earlobes. There was bruising along the neck. And that was the major area of his injuries.

He did have a couple of other areas of much, much lesser injury. He had a small bruise along his left flank. And he had two or three very small quarter-inch bruises on his scrotum, two on the right side, one on the left side.

He further explained that N.M. was suffering from "a significant amount of blood loss." He explained that "in [N.M.'s] case since it wasn't blood loss from the GI track or blood loss from [ ] a major gaping wound that was oozing blood, it was blood loss into the skin, into the scalp, and the neck[,]" or, in other words, internal bleeding. Dr. Kairys further noted that "[t]he pattern [of N.M.'s injuries] was very striking" because "it was fairly extensive bilateral and anterior, on both front and back injury to the head area." Based "on the pattern and the absence of bruising elsewhere in the body[,]" he opined that the injuries were not the result of a fall, and that they had been inflicted on N.M. on the day he was hospitalized and not before.

## B.

Defendant was charged with three counts of second-degree endangering the welfare of a child, in violation of *N.J.S.A.* 2C:24–

4(a), and one count of third-degree aggravated assault, in violation of *N.J.S.A.* 2C:12–1(b)(7).[3] At his trial, Christine, Christine's parents, Christine's sister, the DYFS worker, the investigator from the County Prosecutor's Office and Dr. Kairys testified on behalf of the State. Significantly, N.M. did not testify at defendant's trial. After defendant's motion for judgment of acquittal pursuant to *Rule* 3:18–1 was denied, defendant offered the testimony of several of his relatives.

Jonathan, defendant's youngest brother, explained that he saw N.M. on October 18, 2002 and observed nothing wrong with him; he testified that they played cars and watched television together that afternoon. However, Jonathan also testified that, on that day, he was unable to see N.M.'s face "[b]ecause the only lights that were on was the one right next to the couch and the one in the kitchen. And we were—and, now, I'm standing in front of the light, so not much light gets to him to see him."

Defendant's mother, Joyce, testified that she had been in defendant's house during most of the day on October 18, 2002 and did not observe anything out of the ordinary. Defendant's other brother, Sean, also testified. According to Sean, he had been living in the same house with defendant when Christine and N.M. initially moved in. He explained that N.M. "took a spill" coming out of the bathtub, which accounted for the July 2002 bruising noted by Christine's mother and sister, and that he moved out "a week or two after the bathroom incident."

Jessica, defendant's step-mother, also testified. She explained that, on October 18, 2002, she went to defendant's house to drop off an invitation for the upcoming wedding between Jessica and defendant's father. She noted that she spoke with both Christine

---

[3] In the same indictment, Christine also was charged with one count of second-degree endangering the welfare of a child, in violation of *N.J.S.A.* 2C:24–4(a). However, she ultimately pled to fourth-degree cruelty and neglect of a child, in violation of *N.J.S.A.* 9:6–3, in exchange for an agreement that the State would not seek incarceration and that Christine was "required to testify truthfully at the trial of any codefendants[.]"

and defendant for approximately twenty minutes that evening and that nothing appeared amiss. Following Jessica's testimony, defendant offered two character witnesses, who testified solely in respect of defendant's character for truthfulness, as provided in *N.J.R.E.* 404(a)(1).

Defendant then testified. He repeatedly denied ever striking N.M., either on October 18, 2002, or at any earlier time. He asserted that his mother was with him the entire day of October 18, 2002, and that neither of them observed anything happen to N.M. on that day. He rejected all of the allegations of child abuse leveled against him, claiming that they were the product of Christine's parents, who did not want their daughter and grandson moving out of their home and into defendant's house. When asked why he had not disclosed earlier that his mother had been with him that entire day, he claimed that he did not want to place her in jeopardy, as there was an outstanding warrant for her arrest. However, defendant had no explanation for the fact that his mother had transported both defendant and his youngest brother Jonathan to the police station for questioning and waited for them for over two hours while sitting on a bench in the station's common area.

On January 14, 2005, the jury returned a verdict of guilty on all counts and, on March 4, 2005, defendant was sentenced to a term of imprisonment of eight years.

## C.

Defendant appealed, arguing that (1) the evidence was insufficient to support the guilty verdict; (2) the admission of the child/victim's hearsay statements violated defendant's constitutional rights to confrontation; (3) certain jury instructions were in error; and (4) his sentence was improper. Addressing solely defendant's second point, the Appellate Division reversed. *State v. Buda,* 389 *N.J.Super.* 241, 912 *A.2d* 735 (App.Div.2006). At the outset, the panel concluded that the trial court did not abuse its discretion in finding that N.M.'s hearsay statements to his mother

and the DYFS worker qualified for admission as "excited utterances" under *N.J.R.E.* 803(c)(2), "declin[ing] to hold that the inferences preclude the finding that both statements were made in response to a 'startling event' while N.M. was 'under the stress of excitement caused by the event or condition' and were made 'without an opportunity to deliberate or fabricate.'" *Id.* at 247, 912 *A.*2d 735 (citations omitted).

The Appellate Division then noted that "[r]ecent case law requires reconsideration of the admission of the excited utterances in light of the Confrontation Clause." *Id.* at 248, 912 *A.*2d 735. Canvassing both *Crawford, supra,* and *Davis, supra,* it differentiated between N.M.'s July 2002 spontaneous statement to his mother that "Daddy beat me[,]" and N.M.'s October 2002 statement to the DYFS worker that "Dad says nobody beat me. I fell when I was sleeping in my room." In respect of the former, the panel concluded that "the statement or 'blurt out' to N.M.'s mother after the first incident in July would pose no problem under *Crawford* or *Davis* in terms of admissibility[.]" *Id.* at 256, 912 *A.*2d 735.

In contrast, the panel further concluded that "[t]he October statement involved in this case was taken when N.M. was no longer in danger and there was no 'ongoing emergency'[, and, therefore,] the statement must be deemed testimonial, and admissible only if the declarant was unavailable and defendant had a prior opportunity to cross-examine the declarant." *Id.* at 255–56, 912 *A.*2d 735 (quoting *Davis, supra,* 547 *U.S.* at 822, 126 S.Ct. at 2274, 165 *L.Ed.*2d at 237). Noting that N.M. did not testify at trial, that defendant was not afforded an earlier opportunity to cross-examine N.M., and that there was no claim that "defendant somehow prevented the witness from testifying, which can be deemed a forfeiture or waiver of the Sixth Amendment right to confrontation[,]" *id.* at 256, 912 *A.*2d 735, the panel reasoned that admission of N.M.'s statement to the DYFS worker was error. It concluded that "[a]s the statement in question was both offered and received for the substance of what was said, and because

there is no contention or basis for a finding of harmless error in terms of its impact on any count, we reverse the conviction[s] on all counts." *Ibid.* It further concluded that "a statement to a DYFS worker who reports to a hospital in response to a call concerning possible child abuse, even if taken outside the presence of a police officer or prosecutor's investigator, is taken to gather evidence for use in court proceedings if it is decided that action for protection of the child is required." *Id.* at 256–57, 912 *A.*2d 735.

## C.

The State petitioned for certification, and defendant cross-petitioned; we granted both. *State v. Buda,* 191 *N.J.* 317, 923 *A.*2d 232 (2007). We also granted leave to the Attorney General of New Jersey and to the Association of Criminal Defense Lawyers of New Jersey to appear as amicus curiae. For the reasons that follow, we affirm in part and reverse in part the judgment of the Appellate Division, we reinstate defendant's convictions, and we remand the cause to the Appellate Division for consideration of defendant's remaining points on appeal.

## II.

Focusing exclusively on the Appellate Division's conclusion that N.M.'s October 2002 statement to the DYFS worker was "testimonial" and, hence, barred from admission under *Crawford* and *Davis* unless (1) N.M. was unavailable to testify at trial, and (2) defendant had been afforded an earlier opportunity to cross-examine N.M., the State argues that the Appellate Division failed to consider objectively all of the circumstances surrounding that statement. That analysis, the State urges, leads to the conclusion that the statement was not "testimonial." It asserts that neither this declarant, nor anyone else similarly situated, would have expected the October 2002 statement to have been used against a defendant in a criminal trial and that the primary purpose of the DYFS worker's inquiry of the child/victim was to protect the child prospectively, not to gather evidence of any past facts.

Defendant challenges the Appellate Division's conclusions that admission of N.M.'s spontaneous statement to his mother in July 2002 was proper as either an excited utterance or as a nontestimonial statement.

Amicus, the Attorney General of New Jersey, urges that we conclude that N.M.'s statements to his mother and to the DYFS worker qualify as nontestimonial excited utterances, while amicus, the Association of Criminal Defense Lawyers of New Jersey, addressing solely N.M.'s October 2002 statement to the DYFS worker, conversely urges that we affirm the reasoning and conclusions of the Appellate Division.

In our evaluation of these competing positions, we address first whether N.M.'s hearsay statements to his mother or the DYFS worker qualify as excited utterances admissible pursuant to *N.J.R.E.* 803(c)(2). We then turn to whether those statements are "testimonial" within the meaning of *Crawford* and *Davis.*

### III.

### A.

*N.J.R.E.* 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted[,]" and *N.J.R.E.* 802 starkly explains that "[h]earsay is not admissible except as provided by [the *Evidence Rules*] or by other law." Stated differently, "the hearsay rule applies when a declaration is offered to prove the truth of the statement attributed to the declarant." *State v. Long,* 173 *N.J.* 138, 152, 801 *A.*2d 221 (2002). The opposite also holds: "if evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial." *Ibid.* (citation omitted). All parties agree, as they must, that defendant was charged with assaulting and endangering N.M. and, for that reason, N.M.'s out-of-court statements speaking to the core matter asserted—whether defendant had assaulted and endangered N.M.—were hearsay. Thus, their pre-

liminary admissibility hinges on whether an exception to the hearsay rule applies.

Both the trial court and the Appellate Division concluded that N.M.'s statements to his mother and to the DYFS worker qualified as excited utterances under *N.J.R.E.* 803(c)(2), which exempts from the hearsay rule's proscription on admission "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." We have explained that hearsay exception in these words:

> The excited utterance exception to the hearsay rule allows a trial court to admit certain out-of-court statements relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate. Such statements are admissible under the rationale that excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable. [A] statement constitutes an excited utterance when the circumstances reasonably warrant the inference that the statement was made as an uncontrolled response to the shock of the event before reasoned reflection could have stimulated a self-serving response.
>
> Consistent with the rationale for the excited utterance exception, ... when deciding whether there was an opportunity to fabricate or deliberate, a court should consider the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance. Although each of these factors is important, the crucial element is the presence of a continuing state of excitement that contraindicates fabrication and provides trustworthiness. Thus, in this fact-sensitive analysis, a court must determine whether the facts and circumstances reasonably warrant the inference that declarant was still under the stress of excitement caused by the event.
>
> [*State v. Cotto*, 182 *N.J.* 316, 327–28, 865 *A.*2d 660 (2005) (citations, internal quotation marks and editing marks omitted).]

*See generally State v. Branch*, 182 *N.J.* 338, 357–65, 865 *A.*2d 673 (2005) (setting forth historical analysis of the excited utterance exception to hearsay rule).

At the conclusion of a *Rule* 104 hearing concerning the admissibility of those statements held after the jury was empaneled but before opening statements were delivered, the trial court determined that "in order to properly assess the various factors that the Court must assess, I would like to defer ruling and let the case develop." It explained that "at such time [that the prosecutor may] seek to introduce the evidence, I can take notice of all of the

testimony and circumstances and make a determination as to whether or not it meets the requirements of 803(c)(2)." After hearing the trial testimony of Christine, Christine's parents and Christine's sister, the trial court applied the factors enumerated in *Truchan v. Sayreville Bar & Restaurant,* 323 *N.J.Super.* 40, 48–49, 731 *A.*2d 1218 (App.Div.1999), to determine whether N.M.'s statements qualified as excited utterances; those factors are:

(1) the amount of time that transpired between the initial observation of the event and the subsequent declaration of the statement; (2) the circumstances of the event; (3) the mental or physical condition of the declarant; (4) the shock produced; (5) nature of the statement; and (6) whether the statement was made voluntarily or in response to a question.

[*Ibid.*]

After reviewing the *Truchan* factors separately in respect of each of N.M.'s statements to his mother and to the DYFS worker, the trial court determined that both statements qualified as excited utterances and were thus admissible.

### B.

◼ Trial court evidentiary determinations are subject to limited appellate scrutiny, as they are reviewed under the abuse of discretion standard. *Hisenaj v. Kuehner,* 194 *N.J.* 6, 12, 942 *A.*2d 769 (2008) ("In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion."); *Brenman v. Demello,* 191 *N.J.* 18, 31, 921 *A.*2d 1110 (2007) ("Because the determination made by the trial court concerned the admissibility of evidence, we gauge that action against the palpable abuse of discretion standard."). Guided by that limited scope of review, the Appellate Division sustained the trial court's determination. It explained that "[w]hile the statements in this case were each made at least several hours after the events occurred, we cannot conclude that the trial judge abused his discretion in finding that the prerequisites for admitting the statements under [*Rule* 803(c)(2)] were satisfied." *Buda, supra,* 389 *N.J.Super.* at 247, 912 *A.*2d 735. It reasoned, at length, that

[t]he judge could have reasonably found on the record presented that the then three-and-one-half and four-year-old child addressed the beatings at the first opportunity he had to do so, while still nervous and excited. The October

statement was not made to a family member, was in response to an interrogation interview, and could have been made earlier to N.M.'s mother either when she observed the marks or en route to the hospital. However, defendant was with them at the time. While admission of the statement to [the] DYFS worker ... therefore presents a closer question under *N.J.R.E.* 803(c)(2), we nevertheless decline to hold that the inferences preclude the finding that both statements were made in response to a "startling event" while N.M. was "under the stress of excitement caused by the event or condition" and were made "without an opportunity to deliberate or fabricate." According to [the DYFS worker], when she arrived at the hospital, N.M. "was crying" and "very emotional," and his grandparents helped her "calm him down." N.M. "was crying" and "scared" while talking to [the DYFS worker]. Moreover, ... in this case there was no prior discussion with the child declarant about the identification of the perpetrator and the child's statement did not relate to the identification of a stranger.

[*Id.* at 247–48, 912 *A.*2d 735 (citations and footnote omitted).]

Our review of these evidentiary determinations likewise is limited to determining whether the trial court's decisions concerning the evidentiary admissibility of N.M.'s statements constituted an abuse of discretion. For the reasons ably set forth by the Appellate Division, we too conclude that the trial court did not abuse its discretion when it determined that N.M.'s separate statements to his mother and to the DYFS worker qualified as excited utterances under *N.J.R.E.* 803(c)(2).

Further, our application of the principles in *Branch, supra,* confirms a like result. In *Branch,* seven-year-old twins discovered an intruder in their home and made two sets of statements concerning that intruder. As to the first set, it was "concede[d] that the statements made by [the twins] to their mother and [the police officer], who arrived minutes after the burglary, were excited utterances." *Branch, supra,* 182 *N.J.* at 355, 865 *A.*2d 673. At issue was the second set of statements one of the twins gave to a detective who arrived at the home at least ten minutes later and who did not interview her until after conferring with the officer "who briefed him on what he had learned from his questioning[.]" *Ibid.* The detective then elicited from the child a description that matched Branch's appearance when he was arrested. *Id.* at 356, 865 *A.*2d 673.

*Branch* explained that "[t]he essential elements of an excited utterance are 1) 'a statement relating to a startling event or

condition;' 2) 'made while the declarant was under the stress of excitement caused by the event or condition;' and 3) 'without opportunity to deliberate or fabricate.'" *Id.* at 365, 865 *A.*2d 673 (quoting *N.J.R.E.* 803(c)(2); editing marks omitted). In respect of the first element, *Branch* makes clear that "a spontaneous declaration will be admissible, even if not 'concomitant or coincident with the exciting stimulus,' provided that 'in the light of all the circumstances it may be said reasonably that the exciting influence had not lost its sway or had not been dissipated in the interval.'" *Id.* at 361, 865 *A.*2d 673 (quoting *Cestero v. Ferrara,* 57 *N.J.* 497, 502, 273 *A.*2d 761 (1971)). That requires that we "focus our attention on whether [the declarant] had an opportunity to deliberate" and, hence, fabricate. *Id.* at 366, 865 *A.*2d 673. And, defining whether there has been an opportunity to deliberate or fabricate is a function of several factors:

> In deciding whether there was an opportunity to fabricate or deliberate, a court should consider the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance. The hearsay statement need not be contemporaneous with the startling event as long as there is a showing that the interval was brief and the excited state of the declarant continued. Courts must use a fact-specific analysis to determine whether a statement made after a specific period of time will qualify as an excited utterance. Thus, even a somewhat lengthy delay will not always prevent a statement from being admissible under *Rule* 803(c)(2). Rather, the *Rule* focuses on whether nervous excitement was generated, whether there was a reasonable proximity in time between the event and the declarant's subsequent description of it, and whether there was a lack of opportunity to deliberate or fabricate the circumstances.
>
> [*Long, supra,* 173 *N.J.* at 159–60, 801 *A.*2d 221 (citations, internal quotation marks and editing marks omitted).]

Our application of those factors leads us to conclude that the trial court did not abuse its discretion when it held that both the July 2002 and the October 2002 hearsay statements qualify as excited utterances under *N.J.R.E.* 803(c)(2). In respect of the July 2002 hearsay statement, no fair quarrel can be had that that statement possesses the spontaneity that rests at the core of the excited utterance exception to the hearsay rule: it was an unsolicited "blurted-out" statement made by a then three-year-old child while safely alone with his mother and away from his abuser. We

therefore turn to what the Appellate Division described as the somewhat "closer question" of whether the October 2002 hearsay statement qualifies as an excited utterance.

In respect of the October 2002 hearsay statement, one cannot ignore that the victim/declarant was a three-and-one-half-year-old boy who had been severely beaten earlier that day while in defendant's sole custody and control. The results of that beating, when observed by his mother, produced screaming and a dash to the emergency room and, in the end, required a two-week hospitalization. The hearsay declaration—"Dad says nobody beat me. I fell when I was sleeping in my room."—was made by a sobbing, emotional child in a strange and frightening place—a hospital emergency room—to the DYFS worker, a person previously unknown to the child. We view as significant the length of time between the violence visited on this young child and his statement to the DYFS worker. However, we must assess both the quality and nature of that period. In light of the intervening action-filled chaos and stress-filled events that brought that child ultimately to a hospital emergency room, the time elapsed was not of a kind likely to allow this child to deliberate and, thus, fabricate the statement. In other words, the circumstances of this incident and the mental and physical condition of the declarant did not permit the disqualifying opportunity to deliberate or fabricate.

A comparison between the circumstances presented here and those present in *Branch* additionally supports our conclusion that the trial court did not abuse its discretion when it admitted the October 2002 hearsay statement as an excited utterance. The offending hearsay statements in *Branch* were made while the children/declarants were in their own home, being comforted and protected by their mother, and well after the cause of their exciting influence had fled. In contrast, the first opportunity N.M. had to be free of his assailant did not arise until he was in the hospital and defendant was occupied elsewhere: N.M. had been in defendant's exclusive care that entire day—including the period between Christine's arrival home and her noticing N.M.'s injuries—and, in fact, it was defendant who drove N.M. and his

mother to the hospital. Thus, it was not until N.M. was at the hospital and, more importantly, away from defendant, that N.M. was in the position to make any utterance in respect of who beat him. In these circumstances, we accept that the exciting influence had not dissipated for this three-and-one-half-year-old child at any time prior to reaching the zone of relative safety he may have begun to feel once he was in a hospital room with defendant removed from his presence. In all, " 'it may be said reasonably that the exciting influence had not lost its sway or had not been dissipated in the interval.'" *Branch, supra,* 182 *N.J.* at 361, 865 *A.*2d 673 (quoting *Cestero, supra,* 57 *N.J.* at 502, 273 *A.*2d 761). Finally, there is no proof arising from the specific utterance made here that this child had the opportunity to deliberate or fabricate.

On the whole, then, we conclude that the trial court did not abuse its discretion when it determined that the October 2002 hearsay statement too qualifies as an excited utterance. Therefore, to the extent defendant has appealed from that portion of the Appellate Division's judgment that sustained the admission of both the July 2002 hearsay statement and the October 2002 hearsay statement as excited utterances, that judgment is affirmed.

Although we have determined that N.M.'s statements qualify under the excited utterance exception to the hearsay rule, our task is not complete. Because this is a criminal trial, we also must determine whether hearsay statements otherwise admissible under the *Rules of Evidence* should nonetheless be barred from use in a criminal trial as violative of the Confrontation Clause. Under *Crawford* and *Davis,* that inquiry requires that we determine whether those statements were testimonial in nature and, if so, whether the declarant was unavailable and defendant had a prior opportunity to cross-examine the declarant.

## IV.

### A.

It is no exaggeration to suggest that *Crawford* effected a fundamental shift in the constitutionality of evidence jurispru-

dence. No doubt, in almost identical language, both the Confrontation Clause of the Sixth Amendment, *U.S. Const.* amend. VI, and our own State Constitution, *N.J. Const.* art. I, ¶ 10, provide that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]"[4] However, until *Crawford,* the applicable standard for intersection between the admission of hearsay statements in a criminal prosecution and the confrontation rights of the accused was defined by *Ohio v. Roberts,* 448 *U.S.* 56, 100 *S.Ct.* 2531, 65 *L.Ed.*2d 597 (1980). *Crawford* describes the *Roberts* rule thusly:

> According to our description of [the Confrontation Clause] right [in *Roberts,*] it does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears adequate indicia of reliability. To meet that test, evidence must either fall within a firmly rooted hearsay exception or bear particularized guarantees of trustworthiness.
>
> [*Crawford, supra,* 541 *U.S.* at 40, 124 *S.Ct.* at 1358, 158 *L.Ed.*2d at 186 (citations and internal quotation marks omitted).]

*Crawford* jettisoned the *Roberts*/reliability analytical paradigm with the observation that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with [a] jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Id.* at 62, 124 *S.Ct.* at 1371, 158 *L.Ed.*2d at 199. It reasoned that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199.

 *Crawford* instead concluded that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' "

---

[4] The singular difference between the two provisions is that the federal constitution provides that "the accused shall *enjoy* the right ...[,]" whereas New Jerseys version provides that "the accused shall *have* the right...." More to the point, *Crawford* reinforces the notion that the Confrontation Clause's "bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford, supra,* 541 *U.S.* at 42, 124 *S.Ct.* at 1359, 158 *L.Ed.*2d at 187 (citing *Pointer v. Texas,* 380 U.S. 400, 406, 85 *S.Ct.* 1065, 1069, 13 *L.Ed.*2d 923, 927–28 (1965)).

*Id.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199. It adopted a two-pronged test: "Testimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59, 124 *S.Ct.* at 1369, 158 *L.Ed.*2d at 197. While the factual determinations of whether a declarant is unavailable at trial or whether the defendant has had the prior opportunity to subject that declarant to cross-examination are determinable readily, the question of whether a hearsay statement is testimonial or nontestimonial defies facile definition.

The Court in *Crawford* grappled with that distinction, albeit without providing a comprehensive response. According to *Crawford*, "[t]he text of the Confrontation Clause ... applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192 (citations omitted). It explained that "'[t]estimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Ibid.* (citation omitted). It noted that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Ibid.* It highlighted that "[t]he constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement." *Id.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192–93.

Ultimately, the *Crawford* Court eschewed providing a comprehensive definition of the term "testimonial," and elected instead to identify certain specific examples of what is or is not embraced by the term. Thus, *"ex parte* testimony at a preliminary hearing" and "[s]tatements taken by police officers in the course of interrogations are also testimonial[.]" *Id.* at 52, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 193. In contrast, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements[,]" because "[t]he Clause does not bar admission of

a statement so long as the declarant is present at trial to defend or explain it." *Id.* at 59 n. 9, 124 *S.Ct.* at 1369 n. 9, 158 *L.Ed.*2d at 197 n. 9. It also stated the obvious: that the admissibility of non-hearsay testimonial statements is not affected or otherwise influenced by Confrontation Clause considerations. *Ibid.* ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *See Tennessee v. Street,* 471 *U.S.* 409, 414, 105 *S.Ct.* 2078[, 2081–82], 85 *L.Ed.*2d 425[, 431] (1985).").

■ This unsettled, piecemeal approach to whether a hearsay statement is or is not testimonial led, in part, to *Davis, supra,* which "require[d that the Court] determine when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirement of the Sixth Amendment's Confrontation Clause." *Id.* at 817, 126 *S.Ct.* at 2270, 165 *L.Ed.*2d at 234.[5] Viewing its task as "determin[ing] more precisely which police interrogations produce testimony[,]" *id.* at 822, 126 *S.Ct.* at 2273, 165 *L.Ed.*2d at 237, the *Davis* Court sought to define, at least in part, what constitutes a testimonial statement elicited as a result of a police interrogation as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
>
> [*Id.* at 822, 126 *S.Ct.* at 2273–74, 165 *L.Ed.*2d at 237 (footnote omitted).]

---

[5] *Davis* actually consists of consolidated appeals in *Davis v. Washington* (No. 05–5224) and *Hammon v. Indiana* (No. 05–5705). Although both cases arise in the context of domestic disputes, *Davis* addresses the admissibility of a 911 call where the caller is not called to testify at trial, there is no showing as to the caller's unavailability, and the defendant lacked the prior opportunity to cross-examine the caller, *id.* at 817–20, 126 *S.Ct.* at 2270–72, 165 *L.Ed.*2d at 234–36, while *Hammon* involved questions posed by a police officer to the complainant who, although subpoenaed, failed to appear at trial. *Id.* at 819–22, 126 *S.Ct.* at 2272–73, 165 *L.Ed.*2d at 235–37.

It explained that its "holding refers to interrogations because ... the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses." *Id.* at 822 n. 1, 126 *S.Ct.* at 2274 n. 1, 165 *L.Ed.*2d at 237 n. 1. It made clear, however, that "[t]his is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial." *Ibid.*

Concluding that the answers elicited by the 911 operator from the domestic violence victim were nontestimonial, yet the answers received by the on-scene police officer from the domestic violence victim at a now-quiet call for assistance were testimonial, *Davis* specifically did not address the very issue that confronts us in this case. *Davis* noted that, because it considered the acts of the 911 operator "to be acts of the police ... our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " *Id.* at 823 n. 2, 126 *S.Ct.* at 2274 n. 2, 165 *L.Ed.*2d at 238 n. 2. It is to that compound question—whether N.M.'s separate hearsay statements to his mother or to the DYFS worker constituted statements made in response to police interrogation and, if not, whether they are testimonial—that we now turn.

### B.

The trial court addressed the application of *Crawford* to both N.M.'s July 2002 hearsay statement to his mother as well as his October 2002 hearsay statement to the DYFS worker.[6] According to the trial court, *Crawford* held that "out-of-court statements by witnesses that are testimonial are barred under the [C]onfrontation [C]lause unless witnesses are unavailable and the defendant has had a prior opportunity to cross-examine." Relying on *White v. Illinois,* 502 *U.S.* 346, 112 *S.Ct.* 736, 116 *L.Ed.*2d 848 (1992), the

---

[6] *Davis* was not argued until a year after defendant had been sentenced, and it was decided while defendant's direct appeal was pending before the Appellate Division.

trial court reasoned that *Crawford* could not be read to conclude that "spontaneous declarations by children violate the [C]onfrontation [C]lause or are necessarily considered testimonial." It therefore allowed the introduction of both of N.M.'s hearsay statements, the July 2002 statement via the testimony of Christine, and the October 2002 statement via the testimony of the DYFS worker.

The Appellate Division rejected the trial court's reliance on *White*, particularly in light of *Crawford's* notation that "it 'casts doubt on' *White*, although it 'need not definitively resolve whether [*White*] survives [the Court's] decision [in *Crawford*].'" *Buda*, *supra*, 389 *N.J.Super.* at 254, 912 *A.*2d 735 (quoting *Crawford*, *supra*, 541 *U.S.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199). The panel nevertheless agreed with the trial court that N.M.'s July 2002 hearsay statement to his mother "was not testimonial [because] it appears that most courts treat statements to family members, particularly in close proximity to the event and not in response to any interrogation at the request of the police or otherwise as non-testimonial." *Id.* at 256 n. 11, 912 *A.*2d 735 (citations omitted).

N.M.'s October 2002 hearsay statement to the DYFS worker, however, was treated differently. In the Appellate Division's view, "[t]he October statement involved in this case was taken when N.M. was no longer in danger and there was no 'ongoing emergency.'" *Id.* at 255–56, 912 *A.*2d 735 (citation omitted). Failing to find facts sufficient to justify an "ongoing emergency" that would exempt a hearsay statement to a law enforcement officer from the Confrontation Clause's prohibition against testimonial hearsay, the panel "h[e]ld that the statement of N.M., who did not testify at trial, to the DYFS worker was 'testimonial' and inadmissible." *Id.* at 252, 912 *A.*2d 735. Because the Appellate Division reached opposite results in respect of N.M.'s two hearsay statements—one of which generated the State's appeal, and the other defendant's appeal—we address those statements individually.

### The July 2002 hearsay statement

While driving with his mother, N.M., then age three, without any questioning or instigation blurted out "Daddy beat me." Because N.M. did not testify at trial and was not subject to cross-examination at some earlier time, the admissibility of that hearsay statement—one we already have determined to qualify for admission as an excited utterance under *N.J.R.E.* 803(c)(2)—depends on whether the statement was testimonial. We conclude that it was nontestimonial for the following reasons.

The vice the Confrontation Clause seeks to avoid is two-fold: prohibiting "the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused[,]" *Crawford, supra,* 541 *U.S.* at 50, 124 *S.Ct.* at 1363, 158 *L.Ed.*2d at 192, and barring the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54, 124 *S.Ct.* at 1365, 158 *L.Ed.*2d at 194. Because spontaneous statements do not bear the indicia of "a formal statement to government officers" but instead are akin to "a casual remark to an acquaintance[,]" *id.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192, we conclude, much as the Appellate Division did, that N.M.'s July 2002 spontaneous and unprompted hearsay statement to his mother that "Daddy beat me" is nontestimonial. Therefore, to the extent the judgment of the Appellate Division affirmed the trial court's admission of that statement, it too is affirmed.

### The October 2002 hearsay statement

After being rushed to the hospital on October 18, 2002, and suffering from severe injuries that resulted in a two-week hospitalization, a DYFS worker—in a one-on-one interview with a sobbing and emotional three-year-old boy—asked N.M. if anyone had beaten him. N.M.'s response is as telling as it is heart-wrenching: he replied that "Dad says nobody beat me. I fell when I was sleeping in my room." Again, N.M. did not testify at

trial and he was not subject to cross-examination at some time earlier. Thus, whether that hearsay statement is admissible, even though already qualified for admission as an excited utterance under *N.J.R.E.* 803(c)(2), hinges on whether the statement was testimonial. As with N.M.'s earlier statement, we conclude that it was nontestimonial.

To be sure, unlike N.M.'s July 2002 spontaneous hearsay statement, N.M.'s October 2002 hearsay statement was in response to a question from the DYFS worker as to whether anyone had beaten him. Although some may intimate that the DYFS worker stands in the shoes of a police officer and, hence, that response was the result of a police inquiry, we reject that construction. Examined in its proper context, the DYFS worker had been called in after-hours to respond to an allegation of child abuse concerning a child already hospitalized. When the DYFS worker arrived at the hospital, she was confronted with a crying and upset three-and-one-half-year-old boy who wanted only to be returned to the care of not his mother, and not the man who insisted that the child call him "Daddy," but to his grandparents, who were with him in the hospital room. Finally securing the child alone, the DYFS worker asked what happened. When the child was unresponsive, the DYFS worker asked if any one had beaten him. That question elicited the response at issue.

Once she questioned N.M., the DYFS worker was confronted with a battered child who then and there needed protection from the very adults charged with his basic care. The DYFS worker took additional steps to provide that protection. She asked that the hospital place a guard on N.M.'s room to prohibit either defendant or Christine from entering; she relented only when hospital personnel assured her that, because the walls to N.M.'s room were transparent, they would keep watch on who entered that room. Through the DYFS worker, it also was arranged that N.M. was to be released only to his grandparents and that, for a period of at least three-and-one-half months after his release from the hospital, Christine would be allowed only supervised visitations

with N.M. Defendant remained barred from visiting N.M. Against this backdrop, we must part company with the Appellate Division and conclude that N.M.'s October 2002 hearsay statement also was nontestimonial. That it was said to a DYFS worker did not convert it, in these circumstances, into a testimonial statement.

When she responded to the hospital, the DYFS worker was responding to a life-threatening emergency no different in kind than the function being performed by the 911 operator in *Davis;* she was seeking information from a victim to determine how best to remove the very real threat of continued bodily harm and even death from this three-year-old child. In reaching these conclusions, we are mindful that the primary obligation of a DYFS worker is not to collect evidence of past events to secure the prosecution of an offender, but to protect prospectively a child in need. As we have explained before, "[t]he purpose of Title Nine [of the New Jersey Statutes]"

is to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. *The safety of the children served shall be of paramount concern.* It is the intent of this legislation to assure that the lives of innocent children are *immediately* safeguarded from further injury and possible death and that the legal rights of such children are fully protected.

[*State v. P.Z.,* 152 *N.J.* 86, 96–99, 703 *A.*2d 901 (1997) (quoting *N.J.S.A.* 9:6–8.8 (emphasis supplied)).]

It was in the proper discharge of that obligation that the DYFS worker sought to identify the source of the threat against N.M.; it was in the response to that fundamental inquiry that N.M.'s hearsay statement was elicited.

Some may claim that, on occasion, a DYFS worker becomes an extension of law enforcement. *See N.J.S.A.* 9:6–8.36a (requiring that DYFS "shall immediately report all instances of suspected child abuse and neglect . . . to the county prosecutor of the county in which the child resides"). That claim, standing alone, is insufficient to establish such a relationship. For example, every physician—including those employed full time by the State or other governmental instrumentality—is legally bound immediately to report a gunshot wound to law enforcement authorities. *N.J.S.A.*

2C:58–8(a) ("Every case of a wound, burn or any other injury arising from or caused by a firearm, destructive device, explosive or weapon shall be reported at once to the police authorities of the municipality where the person reporting is located or to the State Police by the physician consulted, attending or treating the case"). Yet, no one would daresay that, in doing so, that physician has *ipso facto become an extension of law enforcement.* The same result must obtain when a DYFS worker reports an instance of child abuse or neglect to the proper authorities: that report is something the DYFS worker is required to do in addition to her paramount duty to care for the safety of children.

We have explained that "[i]n child abuse cases DYFS, the civil authority, must provide information about suspected abuse and neglect to the county prosecutor, the criminal authority[,]" and that "[b]y regulation, the prosecutor is required to consult with DYFS about whether a criminal investigation is necessary and to inform DYFS when a decision is made to initiate criminal proceedings." *P.Z., supra,* 152 *N.J.* at 118–19, 703 *A.*2d 901 (citations omitted). Recognizing the disparate roles played by DYFS and the prosecutor, we have "reject[ed] the contention that because parallel civil and criminal systems are both operating against a defendant at the inception of proceedings in either court, [defendant] must be accorded rights not now required by constitution or statute." *Id.* at 119, 703 *A.*2d 901 (citation and internal quotation marks omitted). Thus, our inquiry is informed by the explicit recognition that a DYFS worker acting in a proper civil role does not trigger considerations that are unique to criminal trials, including the Confrontation Clause.

This is not to say that a DYFS worker in all instances will be acting in a purely civil capacity. One can envision circumstances where the DYFS worker serves predominantly as an agent/proxy or an operative for law enforcement in the collection of evidence of past crimes for use in a later criminal prosecution, circumstances that may well render the hearsay statements thereby procured testimonial under *Crawford. Cf. P.Z., supra* (holding that DYFS

caseworker not required to give Miranda warnings prior to non-custodial interview). However, other than acknowledging that possibility, we need not discuss it further in this case in light of the facts presented.

Here the DYFS worker was doing precisely her job: she was not collecting information about past events for prosecutorial purposes, but gathering data in order to assure a child's future well-being. Indeed, by the time she arrived at the hospital, an investigator from the Prosecutor's Office already was there. The division of duties here was clear: while the Prosecutor's Office investigator was charged with collecting evidence of the crimes visited on N.M., the DYFS worker was responsible for ensuring N.M.'s continued safety and well-being. Viewed in its proper context, N.M.'s statement to the DYFS worker was a statement seeking to end defendant's then-present reign of terror over N.M., a statement no different than the domestic abuse victim's 911 call *Davis* instructs is nontestimonial. Because we conclude that N.M.'s October 2002 hearsay statement also was nontestimonial, we reverse so much of the Appellate Division's judgment that concluded otherwise.

## V.

The judgment of the Appellate Division is affirmed in part and reversed in part, defendant's convictions are reinstated, and the cause is remanded to the Appellate Division for consideration of defendant's remaining issues on appeal.[7]

Justice ALBIN, dissenting.

The right to a fair trial is transcendent—regardless of the nature of the crime or the age of the victim. On that simple

---

[7] Defendant's direct appeal also challenged the sufficiency of the evidence against him, the propriety of certain of the jury instructions, and the correctness of his sentence. *See supra* at 289, 949 A.2d at 768. The Appellate Division noted that "[i]n light of our reversal, we do not have to discuss the other issues raised or sentence imposed." *Buda, supra,* 389 *N.J.Super.* at 257, 912 A.2d 735. Those issues must now be addressed before the Appellate Division.

principle rests the integrity and reliability of every criminal trial. Constitutional rights should not melt away when the accused is charged with a particularly vile crime, even when that crime is against a child. Evidence rules should not be placed in a state of suspended animation, even when a child victim evokes universal sympathy. The Sixth Amendment's right to confrontation applies whether the accuser is four years old or forty years old. Testimonial evidence whether from the mouth of a child or an adult must be subject to cross-examination.

By admitting the child's statements against defendant without requiring the child's appearance as a witness, the majority ignores not only the dictates of the United States Supreme Court's recent decisions in *Crawford v. Washington*, 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), and *Davis v. Washington*, 547 *U.S.* 813, 126 *S.Ct.* 2266, 165 *L.Ed.*2d 224 (2006), but also this Court's own precedent in *State v. Branch*, 182 *N.J.* 338, 865 *A.*2d 673 (2005), which cautioned against expanding the excited utterance exception to the hearsay rule beyond its intended purpose. By denying defendant his right of confrontation and upholding his conviction, the majority dilutes both federal constitutional and state law protections aimed at ensuring that only reliable evidence is admitted in a criminal trial. For those reasons, I respectfully dissent.

## I.

### *October 2002 Statement*

I disagree with the majority that N.M.'s answers to the questions posed by the Division of Youth and Family Services (DYFS) supervisor, particularly N.M.'s answer to the question, "Did anybody beat you?," can be classified as excited utterances. I also disagree that N.M.'s responses to the DYFS supervisor—who was working hand-in-hand with the prosecutor's office investigating possible criminal conduct—was nontestimonial. Because N.M.'s statements dealt with "what happened" and not "what was happening," and because he was in no immediate danger while he spoke with the DYFS worker, given the police presence in the

hospital and his separation from defendant, his statements were testimonial for Sixth Amendment purposes. In my opinion, defendant had a right to cross-examine the child whose statements directly implicated him in a crime. To elucidate those points, it is necessary to examine the facts more fully.

On October 18, 2002, N.M., who was nearly four years old, spent the day at home with defendant. At about 6:00 p.m., when C.M. arrived home from work, N.M. was calmly watching television. Approximately an hour later, C.M. observed a "big red mark on the back of [N.M.'s] neck" and became frantic. C.M. and defendant immediately drove N.M. to the Community Medical Center, only a few minutes from their home.[1]

Approximately ninety minutes later, after N.M. had been examined, treated, and given a number of tests, including a CAT scan, a physician called the Dover Township Police Department and DYFS's Child Abuse Control unit to report that N.M. was a possible child abuse victim. N.M. had suffered multiple, serious injuries to his body. The Police Department in turn contacted the Ocean County Prosecutor's Office. Investigator Kenneth Hess, assigned to the Child Abuse/Sexual Assault Unit of the Prosecutor's Office, responded to the hospital at approximately 8:45 p.m. A few minutes after his arrival, Investigator Hess saw N.M. on a stretcher and explained "who [he] was, where [he] worked, and things like that." In response to a few casual inquiries from the investigator about how he was doing, N.M. replied, "my heart hurts," at which point the child was in tears.

At about 9:20 p.m., Miriam Nurudeen, a supervisor in DYFS's Special Response Unit, arrived at the hospital to investigate the report of possible child abuse. She did not follow her usual protocol of calling the prosecutor's office because she was told that the police department had done so. At the hospital, Nurudeen first spoke to Investigator Hess "to find out how he want[ed] to proceed." As she explained, in an abuse case, "[w]e will interview

---

[1] They may have arrived at the hospital as early as 6:30 p.m.

with the prosecutor or the prosecutor's office will do the interview." She also indicated that "normally, the prosecutor's office is supposed to interview the child first, or sometimes they will ask us to interview the child." Apparently, because Investigator Hess was talking to defendant, he "asked [Nurudeen] to go talk to [the child]."

Along with N.M.'s grandparents, who had arrived at the hospital earlier, Nurudeen entered a hospital room where she found N.M. on a bed. At first, the grandparents spoke with N.M., who was crying and saying that he wanted to go home with them. The DYFS supervisor allowed the grandparents to calm N.M. down and then asked them to leave the room so that she could question him alone.

Nurudeen initially asked N.M., "[W]hat happened?" Because "he didn't answer," she asked again. N.M. then replied, "I fell down in my room." When she followed up with, "How did you fall down?," N.M. responded that "he wanted to go to grandma's." Nurudeen assured N.M. that she would "let him go to grandma, or bring grandma to him, but [she] need[ed] to know what happened to him so this won't happen again." N.M. responded once more that he "fell down in his room." The dialogue continued:

Nurudeen: "Okay. I understand you fell. How did you fall?"

N.M.: "From my bed."

Nurudeen: "What were you doing?"

N.M.: [No answer]

Nurudeen: "Did anybody hit you? Did anybody beat you?"

N.M.: "Dad says nobody beats me. I fell when I was sleeping in my room."

During this exchange, N.M. was "crying" and "scared" and continued to ask for his grandparents.

## A.

While no one could disagree with the majority's observation that N.M.'s final response to the DYFS supervisor was "heartwrenching," I cannot conclude, even under the deferential abuse-of-discretion standard, that it was an excited utterance, an exception

to the hearsay rule. *N.J.R.E.* 803(c)(2). The excited utterance exception provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate" is admissible. *N.J.R.E.* 803(c)(2).

I begin by noting that the majority mistakenly suggests that defendant had the burden of showing that the child "had the opportunity to deliberate or fabricate," *ante* at 298, 949 A.2d at 774, when, in fact, the State bore the burden of proving that the child did not have the opportunity to deliberate or fabricate. The burden of persuasion rests with the proponent of hearsay evidence to show that it falls within an exception to the hearsay rule. *State v. Miller*, 170 *N.J.* 417, 426, 790 A.2d 144 (2002).

In *Cestero v. Ferrara*, 57 *N.J.* 497, 273 A.2d 761 (1971), we discussed the qualifications that need to be met before an excited utterance is introduced into evidence. There, we stated that the stress or shock caused by the event must " 'still[ ] the reflective faculties . . . so that the utterance which then occurs is a spontaneous and sincere response to the . . . external shock,' " and the " 'utterance [must be] made under the immediate and uncontrolled domination of the senses.' " *Id.* at 502, 273 A.2d 761 (quoting 6 *Wigmore on Evidence* § 1747). We also noted that "[i]t must appear that the statements were unpremeditated emanations of the event and so connected with it as to preclude the idea that they were products of" contrivance or calculation. *Ibid.*[2]

---

[2] For purposes of analyzing whether the child's answers to the DYFS supervisor's questioning were excited utterances, the majority confounds the "startling event"—the beating hours earlier—with the mother's screams on learning that her child was injured, the frantic rush to the hospital, and the child's treatment at the hospital. The child's statements must relate to the startling event itself. *See State v. Long*, 173 *N.J.* 138, 158–60, 801 A.2d 221 (2002) ("The Rule requires that . . . the statement [be] related to that event. . . . The hearsay statement need not be contemporaneous with the startling event . . . as long as there is a showing that the interval was brief and the excited state of the declarant continued." (quotation omitted)). It bears repeating that the child was watching television, calmly, on his mother's return home. In order for the child's

In *Branch, supra,* we held inadmissible as excited utterances a seven-year-old girl's statements to an investigating detective describing a burglary suspect because (1) the burglary had occurred twenty minutes earlier; (2) the girl had already discussed the incident with her mother and another officer; (3) the detective ferreted out through questioning information that had not been spontaneously given to her mother or the other officer earlier; and (4) the words did not come "gushing out ... in an excited, unreflective manner." 182 *N.J.* at 343, 365–67, 865 *A.*2d 673. We accepted in *Branch* that the girl's "statement related 'to a startling event,' i.e., the burglary," and that she "was still 'under the stress of excitement caused by the event' fifteen to twenty minutes after the burglary when the detective questioned her while she sat on her mother's lap." *Id.* at 365, 865 *A.*2d 673. We concluded, however, that the girl's statement was not made " 'without opportunity to deliberate,' " an essential element of an excited utterance. *Id.* at 365–67, 865 *A.*2d 673.

I do not see a sufficient distinction between the facts in *Branch* and this case that would justify a different result. In the present case, N.M.'s injuries, as the trial court observed, occurred hours before the questioning by the DYFS supervisor. Before Nurudeen's interview of N.M., his mother, grandparents, a physician, and the prosecutor's investigator had spoken with the child. Nurudeen had to extract responses from N.M. through repeated direct questions, and the words did not come cascading from him.

In *Branch,* we cautioned that "we should not dilute our evidentiary requirements and admit at trial an out-of-court [statement] that does not satisfy *each element* of the excited utterance doctrine, particularly when the declarant is not called as a witness and is available to testify." *Id.* at 367, 865 *A.*2d 673 (emphasis

---

responses to the DYFS supervisor to be "excited utterances," the child must have been under the continuing stress and excitement caused by the beating, not caused by the mother's discovery of the child's injury, which the majority describes as the "intervening action-filled chaos." *Ante* at 297, 949 *A.*2d at 773. The "intervening action-filled chaos" is not a substitute for the startling event.

added). In the present case, there is no suggestion that N.M. was unavailable as a witness. In *Branch*, in detailing the history of the excited utterance rule, we noted the American Bar Association's observation that courts had " 'invoke[d] tortured interpretations of the "excited utterance" exception in order to sustain the admissibility of a child's out-of-court statement.' " *Id.* at 362, 865 A.2d 673 (quoting *State v. D.R.*, 109 *N.J.* 348, 361, 537 A.2d 667 (1988)); *see also D.R., supra*, 109 *N.J.* at 375–78, 537 A.2d 667. We also recognized in *Branch*, as we had suggested in *D.R.*, that "courts, perhaps even unconsciously, felt pressed to distort the analysis of the excited utterance exception in order to justify the admission of evidence necessary to uphold convictions for particularly repugnant crimes." *Branch, supra*, 182 *N.J.* at 362, 865 A.2d 673.

Without acknowledging so, the majority has decided to part ways with *Branch*, which warned about "the increasingly frequent use of the excited utterance exception as the vehicle for introducing past narratives from non-testifying declarants." *Id.* at 365, 865 A.2d 673. However distressed N.M. must have been at the time he was questioned by the DYFS supervisor, given the nature of the interview and the passage of time, the statements were not a spontaneous response to an " 'external shock' " or " 'made under the immediate and uncontrolled domination of the senses.' " *Cestero, supra*, 57 *N.J.* at 502, 273 A.2d 761 (quoting 6 *Wigmore on Evidence* § 1747). As the DYFS supervisor acknowledged, N.M. did not "want to talk to [her]," which required her to ask direct questions. His responses revealed, to the degree a child of tender years can do so, reflection. That the DYFS supervisor performed her job in a proper and commendable manner does not mean that a hearsay statement is rendered admissible. The State could have called N.M. to the stand, permitting defendant the right of cross-examination, or chosen not to use the child's statement.

Because I believe that the result in this case is dictated by *Branch*, I respectfully dissent from the majority's conclusion that

the October 18th statement to Nurudeen was an excited utterance. I would reverse defendant's conviction because the admission of the child's damning statements violated our evidence rules, denying defendant a fair trial. Ordinarily, that would end my analysis. However, the majority erroneously concludes that the child's statements also do not offend the Sixth Amendment. Therefore, I now analyze those statements through the prism of the Confrontation Clause.

### B.

Under both *Crawford* and *Davis*, N.M.'s answers to the DYFS supervisor's questions—questions which were intended to elicit information about a possible crime—were testimonial statements. Because N.M. was never subject to cross-examination and was apparently available as a witness, the admission of those hearsay statements violated the Sixth Amendment's Confrontation Clause.

That constitutional provision prohibits the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford, supra,* 541 *U.S.* at 53–54, 124 *S.Ct.* at 1365, 158 *L.Ed.*2d at 194 (emphasis added). To determine whether N.M.'s statement was testimonial, we must begin with how the United States Supreme Court has defined the term "testimonial."

In *Crawford*, the Court indicated that a statement is testimonial when it is "made for the purpose of establishing or proving some fact," such as in the case of "[a]n accuser who makes a formal statement to [a] government officer[ ]." *Id.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192. "Statements taken by police officers in the course of interrogations," the Court suggested, were properly classified as testimonial. *Id.* at 52, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 193.

In *Davis*, the Supreme Court refined that test by defining when a statement made to the police is nontestimonial and when such a statement is testimonial. A statement is not testimonial when it is

"made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis, supra,* 547 *U.S.* at 822, 126 *S.Ct.* at 2273, 165 *L.Ed.*2d at 237. A statement is testimonial when it is made in "circumstances objectively indicat[ing] that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822, 126 *S.Ct.* at 2273–74, 165 *L.Ed.*2d at 237.

*Davis* makes clear that an ongoing emergency relates to events that are happening at the moment, not events that have occurred in the past. Thus, a statement relating to an ongoing emergency is a cry for help—a statement made for the purpose of stopping a crime in progress—not a narrative of a crime already committed that can be used in a future prosecution. *See id.* at 827–78, 126 *S.Ct.* at 2276–77, 165 *L.Ed.*2d at 240–41. In *Davis,* the Supreme Court concluded that the statements made by the domestic violence victim to the 911 operator, identifying her husband as her assailant, were nontestimonial because her husband was in the process of beating her and because the "primary purpose" of the statements was to resolve an emergency in progress rather than to give information about a crime that had occurred earlier. *Ibid.* On the other hand, in *Hammon v. Indiana,* a companion case to *Davis,* the Court held that the oral report and affidavit provided by the domestic abuse victim to the police who responded to her home were testimonial because the police were investigating a crime that had already happened and because "there was no immediate threat" to the victim—no ongoing emergency—given that the abusive husband had been separated from his wife while she made her statements. *Id.* at 829–30, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242.

The majority finds that the child's statement to the DYFS supervisor, "seeking to end· defendant's then-present reign of terror," was "no different than the domestic violence abuse victim's 911 call" in *Davis. Ante* at 308, 949 *A.*2d at 780. But there

is a difference. The victim in *Davis, supra,* was being beaten as she spoke with the 911 operator. 547 *U.S.* at 827, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240. Here, unlike in *Davis,* N.M. did not make his statements to the DYFS supervisor to stop a beating that was happening at the moment. *See ibid.* Instead, his statements implicated defendant in a crime that defendant allegedly had committed hours earlier.

Indeed, the facts in this case are most similar to those in *Hammon.* After the prosecutor's investigator and the DYFS supervisor arrived at the hospital in response to the call that N.M. was the possible victim of child abuse, there was no immediate danger to N.M. In addition to Nurudeen and Investigator Hess, present at the hospital to protect N.M. were a Dover Township police detective, hospital personnel, and N.M.'s grandparents. As in *Hammon,* N.M. was separated from his suspected abuser. *See ibid.* The purpose of the DYFS supervisor's interrogation was to determine what had happened to N.M., how his serious injuries were inflicted—not to gather information to resolve a crime in progress.

Moreover, the statement made by N.M. is no less testimonial for Sixth Amendment purposes because the DYFS supervisor conducted the interrogation rather than the prosecutor's investigator, who gave her permission to talk to the child. *See Crawford, supra,* 541 *U.S.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192 ("An accuser who makes a formal statement to government officers bears testimony[.]"). As Nurudeen explained, she conducts child abuse investigations jointly with the prosecutor's office. According to Nurudeen, "when we respond to any child abuse cases, we are supposed to call the prosecutor's office, and they would normally tell us how to proceed." Sometimes she interviews a child together with a prosecutor's investigator and sometimes the investigator speaks with the child. In this case, Nurudeen was acting jointly with Investigator Hess; there was no question that they would be sharing information. Whatever they learned would be put to two purposes: child safety, i.e. removal of the child from

the home, if necessary, and potential criminal prosecution of the abuser.[3]

In my view, a DYFS supervisor who conducts an interrogation in connection with an ongoing criminal investigation by a prosecutor's office may be considered, under certain circumstances, an agent of law enforcement for Sixth Amendment purposes. Although the United States Supreme Court in *Davis, supra,* noted that it was "unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial,'" it did find that "[i]f 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers." 547 *U.S.* at 823 n. 2, 126 *S.Ct.* at 2274 n. 2, 165 *L.Ed.*2d at 238 n. 2. Just as a 911 operator would be expected to report to law enforcement officers any information learned about a past crime, undoubtedly, Investigator Hess expected Nurudeen to determine through questioning N.M. the cause of N.M.'s injuries.

In light of the facts presented to us, I can only conclude that the DYFS supervisor, for the limited purpose of questioning the child about the source of his injuries, was acting as an agent of Investigator Hess. Clearly, Nurudeen, who was collaborating with Investigator Hess, had dual primary purposes when questioning N.M.: to protect him from future harm and, if necessary, remove him from his home for his safety, and to elicit information about a possible crime. In the circumstances here, protection of the child and prosecution of the offender were inextricably intertwined.

---

[3] The majority suggests that the DYFS supervisor was the caseworker for the child for a period "of at least three-and-one half months after [the child's] release from the hospital." *Ante* at 305, 949 *A.2d* at 778. However, the supervisor's involvement in the case was limited to the events beginning on the evening of October 18, 2002 into the morning of October 19, 2002. That DFYS took the necessary steps to protect the child in the following months in no way alters the supervisor's collaborative role with law enforcement on the evening she questioned·the child. Although there is nothing wrong with such collaboration, the statements elicited from the child are nonetheless testimonial.

I understand that the notion of dual primary purposes was not addressed in *Davis*. Indeed, the United States Supreme Court specifically emphasized that the test set forth in *Davis* "suffice[d] to decide" those cases. *Id.* at 822, 126 *S.Ct.* at 2273, 165 *L.Ed.*2d at 237. The Court was prescient to foresee that a multitude of variations on the theme would arise and did not expect a court, such as our own, to apply its words mechanistically to reach a result contrary to the logic of its holding. The majority's interpretation of *Davis* provides an invitation to law enforcement to do an end-run around the Confrontation Clause by sending DYFS workers in to do the initial questioning in every child abuse case.[4]

I am not saying that persons mandated by law to report information about a crime become agents of law enforcement for Confrontation Clause purposes in every case or even most cases. However, I would hold that when a government employee, such as the DYFS supervisor here, collaborates regularly with law enforcement and, at its direction, conducts an interview of a child "to establish or prove past events potentially relevant to later criminal prosecution," *id.* at 822, 126 *S.Ct.* at 2273–74, 165 *L.Ed.*2d at 237, regardless of whether the questioner had multiple purposes, the statements elicited are testimonial and must be subject to cross-

---

[4] The majority appears to be out of step with other state courts that have interpreted *Crawford.* For example, other courts have held that a social service worker may have more than one primary purpose in conducting an interview with a child, potentially making the statements elicited in the interview testimonial in nature. *Compare In re S.P.*, 218 *Or.App.* 131, 178 *P.*3d 318, 328 (2008) (holding that statement made to child protective services intake worker who was collaborating with law enforcement was testimonial, noting that in such circumstances child protective workers have "concurrent 'primary purpose[s]' " and that "where an interview or evaluation process serves multiple purposes, the nature and extent of police or prosecutorial involvement in that process is a very substantial ... consideration"), *with Seely v. State*, 373 *Ark.* 141, — *S.W.*3d ——, ——, 2008 *WL* 963516 (Ark.2008) (holding that in case in which child sexual abuse victim was questioned by social worker prior to being given medical treatment, statement was not testimonial because social worker was not acting "as a government agent," because no "police officer or other law-enforcement official instigate[d], observe[d], or participate[d] in ... interview" and purpose of questions was to "defin[e] the scope of [a] medical examination").

examination. *See People v. Stechly*, 225 *Ill*.2d 246, 312 *Ill.Dec.*
268, 870 *N.E.*2d 333, 365–67 (2007) (holding that child's statements
to registered nurse and social worker were testimonial both
because they were mandated reporters and because they were
cooperating with law enforcement); *State v. Justus*, 205 *S.W.*3d
872, 880–81 (Mo.2006) (concluding that statement made by four
year old to child protective services worker in interview setting
was testimonial).

## II.

### *July 2002 Statement*

I disagree with the majority's conclusion that the trial court
properly analyzed N.M.'s unprompted statement in the car as an
excited utterance.

C.M. testified that on July 3, 2002, at approximately 9 a.m., she
was driving N.M. to her sister's house when she heard N.M. say
from the backseat, "Daddy beat me." C.M., somewhat shocked,
replied, "What?" C.M. recalled only that N.M. said "something
about the nighttime." C.M. then suggested to N.M. that he might
have had a dream, and dropped him off at her sister's house.
Later that day, while playing with N.M., his grandfather noticed
"hand marks on his behind."

### A.

The trial court admitted the child's hearsay statements as
excited utterances. *See N.J.R.E.* 803(c)(2). As previously indicat-
ed, "[t]he essential elements of an excited utterance are 1) '[a]
statement relating to a startling event or condition'; 2) 'made
while the declarant was under the stress of excitement caused by
the event or condition'; and 3) 'without opportunity to deliberate or
fabricate.'" *Branch, supra*, 182 *N.J.* at 365, 865 *A.*2d 673 (quot-
ing *N.J.R.E.* 803(c)(2)). In my opinion, the trial court's findings
were inadequate to support the conclusion that at the time the
child made the statements he was "under the stress of excitement

caused by the event" and did not have "the opportunity to deliberate."

First, without any supporting evidence, the trial court "infer[red] ... that the statement was made the morning after [N.M.] received [his] injuries." The record, however, does not reveal when the "event" causing his injuries occurred. No evidence was presented concerning what activities N.M. had been engaged in before he made the statement, who had been watching him earlier that morning, what time he had gone to bed on July 2nd, whether defendant had been with N.M. the previous night, or whether N.M. was even talking about the previous night. No evidence or argument was presented regarding whether N.M. was for some reason unable to "deliberate"—in other words, unable to think about his injury as a child would during the intervening hours—before making the statements.

Second, the court found that the child was under the "[n]ervous excitement" of the event, even though the court stated it had no reason to believe that N.M. "was visibly upset or in any sort of distress" while making the statement. Although the court correctly maintained that "[n]ervous excitement" could be indicated by "a myriad of ways reflecting a person's age, experience and psychological makeup," without a factual or legal basis, it held that a "blurted out ... statement without prompting or questioning" was sufficient to meet the requirement of excitement in light of N.M.'s "tender age of 3."

In determining whether a witness is still under the stress of an event and had an "opportunity to deliberate," the court should have considered the following factors: "the time elapsed between [the] event and [the] statement, the continuing influence of the excitement caused by the [event], the circumstances surrounding the taking of the statement, and whether the statement was in response to questions." *Id.* at 366, 865 *A.*2d 673. The court failed to analyze the issue in accordance with that standard.

The majority states that "no fair quarrel can be .had that that statement possesses the spontaneity that rests at the core of the

excited utterance exception." *Ante* at 296, 949 *A.*2d at 773. The majority believes that because N.M.'s "blurt out" was spontaneous, it was therefore necessarily nontestimonial. *Ibid.* To the extent that that statement suggests that "spontaneity" trumps the three essential elements defining an "excited utterance," I disagree. Although spontaneity may inform the discussion of those elements, it is not a substitute for them.

I would remand for a new *N.J.R.E.* 104 hearing for a determination concerning whether the child's statement in the car meets the standard for admission as an excited utterance.

### B.

I agree with the majority's conclusion that the child's remark to his mother in the car was not a testimonial statement as defined in *Crawford* and therefore its admission does not violate the Confrontation Clause. Because I part with the majority on the basis for reaching that conclusion, I express my reasons separately.

As explained in *Crawford, supra,* the Framers intended the Confrontation Clause to prohibit the introduction at trial of out-of-court *testimonial* statements untested by cross-examination. 541 *U.S.* at 53–54, 124 *S.Ct.* at 1365, 158 *L.Ed.*2d at 194. Such statements include affidavits, depositions, grand jury testimony, and certain "[s]tatements taken by police officers in the course of interrogations." *Id.* at 51–52, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 193. The Confrontation Clause's principal purpose was not to interdict the introduction of "[a]n off-hand ... remark" or a "casual remark to an acquaintance," but rather those statements elicited during certain *ex parte* examinations that were not subject to cross-examination. *Id.* at 50–51, 124 *S.Ct.* at 1363–64, 158 *L.Ed.*2d at 192; *see also Davis, supra,* 547 *U.S.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. The statement at issue here was a child's unprompted remark to his mother in the privacy of a car, not "[a]n accuser['s] ... formal statement to government officers." *Crawford, supra,* 541 *U.S.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192; *see also Stechly, supra,* 312 *Ill.Dec.* 268, 870 *N.E.*2d at 366

(holding that statement to mother was nontestimonial because mother "was in no way acting on behalf of law enforcement, attempting to gather evidence for a future prosecution"). By the standards enunciated in *Crawford* and *Davis,* N.M.'s statement cannot be deemed testimonial.

To the extent that the majority suggests that spontaneous statements are per se nontestimonial, I disagree. *Ante* at 303–05, 949 *A.*2d at 777–78. Indeed, *Davis* refutes that suggestion. The United States Supreme Court specifically noted in that case that "[t]he Framers were no more willing to exempt from cross-examination *volunteered testimony* . . . than they were to exempt answers to detailed interrogation." *Davis, supra,* 547 *U.S.* at 822 n. 1, 126 *S.Ct.* at 2274 n. 1, 165 *L.Ed.*2d at 237 n. 1 (emphasis added). The statements made by the domestic violence victim to the 911 operator in *Davis* were nontestimonial not because she was speaking spontaneously, but because she was describing an ongoing emergency—her husband's assault upon her—as it was "*actually happening.*" *Id.* at 827, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240. The statements given to the police by the domestic abuse victim in *Hammon* were testimonial, regardless of whether they were spontaneous, because the victim was relating " 'what happened' " rather than " 'what [was] happening' " and because there was no "immediate threat" to her given the police presence in her home. *Id.* at 829–32, 126 *S.Ct.* at 2278–80, 165 *L.Ed.*2d at 242–43.

Nonetheless, for the reasons I have stated, I do not find that the admission of the child's statement would violate the Confrontation Clause.

### III.

The Confrontation Clause demands that when the State offers a testimonial statement against the accused, the reliability of that statement must be tested in the crucible of cross-examination. The Sixth Amendment does not exempt a child's testimonial statements from its sweep. From the viewpoint of the accused who, if convicted, is facing prison, it makes no difference whether

the testimonial statement that damns him comes from the mouth of a child or an adult—the Sixth Amendment guarantees him the right to confront his accuser. In this case, the State presented N.M.'s out-of-court testimonial statements as evidence against defendant, without giving defendant the opportunity to cross-examine him. The introduction of those statements contravened the Confrontation Clause. The result the majority reaches today, in its haste to uphold defendant's conviction, is driven by a distorted analysis of the precedents of the United States Supreme Court and this Court.

Because certain statements by N.M. were admitted into evidence in violation of our hearsay rules and the Sixth Amendment, defendant's convictions should be reversed. For the reasons I have expressed, I respectfully dissent.

Justices LONG and WALLACE join in this opinion.

*For affirmance in Part/reversal in Part/remandment*—Chief Justice RABNER, Justices LaVECCHIA, RIVERA–SOTO and HOENS—4.

*For Dissent*—Justices LONG, ALBIN and WALLACE—3.