**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3031-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

E.S.[1]

     Defendant-Appellant.

_____

Argued March 22, 2021 – Decided May 3, 2021

Before Judges Sabatino, Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No.15-10-1247.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the brief).

Ian C. Kennedy, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and

---

[1] We use initials to protect the victim's privacy. R. 1:38-3(d)(12); see also N.J.S.A. 2A:82-46.

on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Tried by a jury in October 2018, defendant E.S. was found guilty of eight counts of sexual assault and other offenses he committed against his fiancé's minor daughter, K.I.

Specifically, defendant was convicted of first-degree aggravated sexual assault by an act of digital/penile sexual penetration upon K.I., a victim less than thirteen years of age, N.J.S.A. 2C:14-2a(1) (counts one and two); first-degree aggravated sexual assault by an act of sexual penetration (cunnilingus) upon a victim under thirteen, N.J.S.A. 2C:14-2a(1)(count three); second-degree attempted aggravated sexual assault by attempting to perform an act of sexual penetration (fellatio) upon a victim under thirteen, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2a(1)(count four); second-degree sexual assault by an act of sexual contact (intentionally touching the victim's vagina) upon a victim under thirteen, N.J.S.A. 2C:14-2b(count six); second-degree sexual assault by an act of sexual contact (intentionally touching the victim's breasts/buttocks) upon a victim under thirteen, N.J.S.A. 2C:14-2b (counts seven and eight); and second-degree endangering the welfare of a child by sexual conduct that would impair or debauch the child's morals. N.J.S.A. 2C:24-4a (count ten).

The trial judge sentenced defendant to concurrent fifty-year custodial terms, subject to an eighty-five-percent parole disqualifier pursuant to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2 on counts one, two, and three. Count six was merged into count one. On the remaining counts, defendant was sentenced to concurrent eight-year custodial terms, subject to an eighty-five-percent parole disqualifier under NERA. Defendant was sentenced to serve his terms on all counts concurrently.

On appeal, defendant primarily argues the State wrongfully failed to disclose to his counsel until the middle of trial a report of a physician who examined K.I. two days after she had reported her allegations of sexual abuse to the police. Defendant contends the doctor's report contains relevant and, to some degree, exculpatory information. Although the report was not in the prosecutor's files, defendant argues it should have been obtained and supplied to his attorney by the State before trial, pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and also pursuant to the criminal discovery rules.

When the existence of the report surfaced during his defense counsel's cross-examination of the victim, defendant moved for a mistrial, which the trial judge denied. Defendant claims he was unfairly prejudiced by these circumstances, and therefore should be granted a new trial.

3

Additionally, defendant argues the trial court misapplied the "fresh complaint" doctrine by allowing the State to present hearsay statements of the child she made to a relative.

Defendant lastly contends his sentence, which was enhanced to fifty years under the "Jessica Lunsford Act," L. 2014, c. 7. § 1, is illegal because the jury's verdict did not make sufficient findings to establish that his sexual offenses occurred after the Act's effective date of May 15, 2014.

For the reasons that follow, we affirm.

I.

Given their graphic nature, we summarize the State's proofs from the five-day trial only to the extent necessary to provide context for the legal issues.

Events Leading up to the Abuse

The victim in this case, K.I., was born in July 2002. At the time of the charged events, occurring between August 1, 2013 and September 21, 2014, K.I. was under the age of thirteen.

In 2006 K.I.'s mother ("the mother") met defendant. Soon thereafter the couple, along with K.I., moved into an apartment in Bergen County. The couple was engaged but never married. At times, defendant was imprecisely referred to as K.I.'s stepfather.

Before the acts of abuse, K.I. had come to think of defendant as a "father figure" because her own biological father ("the father") was not involved in her life. From a young age, K.I. called defendant "Daddy." Defendant helped K.I. with her homework, watched television with her, and supported her aspirations of joining the military.

Beginning in or around August 2013, when K.I. was only eleven years old, defendant and K.I.'s relationship changed. Approximately one year earlier, defendant, K.I. and the mother moved into a new apartment, just down the street from their previous dwelling. K.I. testified that a few months after moving into that apartment defendant began to abuse her sexually.

The family generally followed a routine schedule. The mother worked from around 8:00 a.m. until about 5:00 p.m. most days. In the morning she would drop off K.I. at her elementary school down the street from their apartment. At 3:15 p.m., when school ended, K.I. and her cousin would walk a few blocks to the house of her maternal grandmother ("the grandmother"), where she would wait until defendant picked her up and brought her home. Defendant and K.I. were typically alone at their residence until 6:00 p.m. when the mother returned from work.

The Instances of Abuse and the Photographs

5

According to K.I., over the course of the nearly year-long period of abuse, defendant sexually assaulted her more than an estimated thirty times. She testified in detail about a few of those specific instances.

The first such assault occurred when K.I. was eleven years old, in August 2013. K.I. testified that, just after she had taken a shower, when mother was not home, defendant led her by the arm to the bed he shared with the mother. K.I. at the time was wearing just a towel. Defendant laid K.I. on her back, and without saying anything, penetrated her digitally. When he finished, he asked K.I. "if [she] liked it." She did not respond.

Although K.I. did not provide a specific timeframe for when the next instance of abuse occurred, she testified that on that second occasion defendant again sexually assaulted her when they were home alone. During this episode, K.I. was just "in [her] room, laying on [her] bed" and wearing shorts, when defendant came in, pushed her shorts to the side, and used his tongue to perform cunnilingus on her. He said nothing to her during the episode or after.

On a third occasion, which K.I. again did not pinpoint with a specific timeframe, defendant entered her room while she was laying in bed. Without saying anything, he penetrated her with his penis. Because of the pain, she cried. According to K.I., he stopped and "freaked out," pacing back and forth in the

6

room, asking if she wanted him to "leave." K.I. took this to mean that he would leave forever. She told him no because she "knew [her] mom would get mad . . . [i]f she found out" and defendant was still "like a father" to her. After this assault, K.I. noticed she was bleeding when she went to the bathroom.

K.I. recounted that defendant's sexual assaults of her by penile penetration occurred between one and ten times. She recalled that, during these assaults, defendant carried a white rag to wipe them both down with when he had finished.

On a fourth subsequent occasion, again on an unspecified date, defendant attempted to force K.I. to perform fellatio on him by pushing her head towards his genitals. However, she refused.

The State's investigation also revealed incriminating photographs found on two electronic devices. First, on a tablet previously owned by K.I. and later given to a family friend, there were numerous photos of defendant and K.I. kissing on the lips, cheek, and touching tongues. The photos had been taken as early as December 25, 2013. Second, multiple photos of K.I. were on defendant's cell phone, which included salacious and inappropriate photos of her bare breasts with her face in the picture. Forensic experts testified for the State as to how these photos had been extracted from the deleted images stored on the respective devices.

A-3031-18

K.I. testified that she took the photos on defendant's phone in the hope that it would satiate him and stop him from further pursuing physical sexual abuse of her.

Allegations Against K.I.'s Biological Father

In an effort to impeach K.I.'s credibility, defense counsel focused at trial upon an allegation made by K.I. of sexual abuse by her biological father. Specifically, in 2013, when K.I. was twelve years old, defendant told her mother that K.I. had confided in him that K.I.'s biological father had inappropriately touched her while bathing her. The mother approached K.I. about this allegation, and asked her if she had anything to tell her, and "Did he [(meaning the father)] touch you?" K.I. did not verbally respond. Instead, "all she did" was nod and cry. According to the mother, while this conversation was transpiring between her and K.I. alone in K.I.'s room, defendant was "[l]urking around in the kitchen and in the doorway."

At that time, no action was taken to file a criminal report against K.I.'s biological father. That was because he no longer had contact with K.I. and had not had contact with her since about the time that she was four years old, except for occasional visits for birthdays. However, in 2014, when law enforcement authorities became involved in investigating the allegations against defendant,

K.I. disclosed to a police detective that her biological father had also abused her. The matter was referred to authorities in Passaic County, a locale where the abuse could have occurred.[2]

K.I. later recanted her statement against her biological father. According to K.I., she realized as she grew older that there was a "difference" between what the father had done and what defendant had done. Defense counsel attempted to cross-examine her at trial about this. K.I. explained she had told defendant about the father's alleged abuse so that defendant would talk to her mother about it, somehow making it easier for her to then disclose the abuse that defendant was perpetrating against her. She did not, however, tell her mother about defendant's abuse.

The Text Messages Between Defendant and K.I.

After nearly a year of being sexually abused by defendant, K.I. sought to cease the abuse and attain a semblance of normalcy. She began to refuse defendant's advances and push him away. She asked for their relationship to return to the way it was before he had begun abusing her.

---

[2] It is unclear from our record whether any criminal charges were ever brought against the father.

Eventually, however, on September 20, 2014, defendant gave K.I. (who was at that point twelve years old) a "deadline" for him to engage in sexual conduct with her. This communication was preserved in the following text exchange,[3] which occurred at about 11:00 p.m. that day, while the two were home alone:

> [Defendant:] Hey babe, lets F***
>
> [K.I.:] I'm doing my nails. And delete that message.
>
> [Defendant:] I know you're doing your nails. I'm just asking can we F***
>
> [K.I.:] Oh yeah. Delete these messages.
>
> [Defendant:] Forget it. I'm going to kill myself tomorrow night.
>
> [K.I.:] No daddy. Why, what did I do? I said yeah.
>
> [Defendant:] Forget it.

This exchange led to an argument between K.I. and defendant a day or so later.

K.I.'s Argument with Defendant and Her Revelation of His Abuse

---

[3] The text conversation was not presented to the jury in the form of an exhibit at trial but was elicited through K.I. refreshing her recollection by reading the exchange. It is presented here as a block quote for legibility. The State's forensic expert who analyzed defendant's phone confirmed the exchange occurred, and indicated the corresponding time and date stamps in his testimony.

Around midday on Sunday, September 21, 2014, while the mother was at a softball game, K.I. and defendant began to argue about the so-called "deadline." As their argument escalated, K.I. and defendant pushed each other. Defendant threatened to kill himself with a switchblade he had previously shown to K.I., which was still in his pocket. Despite that threat, K.I. still refused to allow defendant to engage in sexual conduct with her. She demanded that he drive her to grandmother's house down the street, fearing that he would commit suicide in front of her. He drove her there. As she got out of his vehicle, defendant told K.I. that "he was dead to [her]."

Still crying as she entered grandmother's house, K.I. revealed that she and defendant just had an argument but did not yet disclose the abuse. The grandmother and K.I. decided to call the mother. During that call, K.I. told the mother that she and defendant had gotten into an argument and he pushed her, and that defendant further threatened to kill himself.

The mother testified that she then called defendant, who told her that the argument came about because K.I. "caught an attitude" and that he shoved her back as she tried to walk out the door. K.I. stayed that night at the grandmother's house.

K.I.'s Fresh Complaint to Her Step-Grandmother

11

The fresh complaint testimony at issue stems from a conversation between K.I. and another relative, her step-grandmother,[4] that occurred the following day, on September 22, 2014. During that conversation, K.I. revealed that defendant had been molesting her.

The step-grandmother testified that she and K.I. shared a close relationship. The two of them would routinely exchange phone calls when K.I. finished school each day at around 3:15 p.m., and usually talked about how her day at school was.

The step-grandmother recounted that, on at least two previous occasions, defendant asked her to use the close relationship she had with K.I. to persuade K.I. to dress more "appropriately." He felt that her clothes were too revealing and tight. Although the step-grandmother herself had no criticism of K.I.'s clothing, she agreed to do so.

The step-grandmother also testified that at events and family functions "[i]t just always seemed that [defendant] was always . . . watching what [K.I.] was doing." Further, she noted that defendant complained K.I. was "taking him

---

[4] The record indicates that the person identified as the step-grandmother is the wife or significant other of K.I.'s maternal grandfather.

for granted, that she was an ingrate, that he did so much for her and she wasn't appreciative of him."

On the day of the relevant conversation, the step-grandmother had spoken to the mother about a Facebook post she had seen,[5] which concerned her. This reference to the Facebook post was objected to by defense counsel, and the objection was sustained. In speaking with mother, the step-grandmother learned that defendant and K.I. had been in an argument that caused K.I. to stay at her grandmother's house overnight.

That day, K.I. called the step-grandmother as she normally did after school. During the first portion of the conversation, the step-grandmother testified that they talked about how school went. Initially, K.I. seemed "happy" and fine. However, when the step-grandmother asked about the argument with defendant, K.I. became "a little bit more reserved, [and was] shocked that [the step-grandmother] brought it up."

The step-grandmother testified that K.I. talked about the argument. She told K.I. that she was going to ask her an awkward question, and proceeded to

---

[5] At trial the reference to the Facebook post was objected to by defense counsel and sustained by the trial judge. The admissibility of that Facebook post had previously been taken into consideration during a motion hearing and held inadmissible.

ask "if [defendant] ever touched her totito [(translated as 'vagina')]." K.I. fell silent. After a bit of time, the step-grandmother gave her assurances and reasserted her initial question. At that point, K.I. began to cry. The step-grandmother then asked K.I. a yes-or-no question as to whether defendant had touched her breasts and other body parts, to which K.I. responded "yes."

Upon hearing this, the step-grandmother fell silent. K.I. then said: "But, Mema, there's more." The step-grandmother then asked her if defendant had engaged in sexual intercourse with K.I., and she responded "yes." According to the step-grandmother, K.I. was scared to tell her mother about this, so she offered to help K.I. have the conversation.

The step-grandmother contacted the mother and told her that they needed to talk in person, although she did not disclose why. The mother responded that K.I. had a preplanned doctor's appointment that evening, but they would come over directly afterwards.

When the mother arrived home, both K.I. and defendant were present. The mother admonished them both for having an argument, not yet knowing what K.I. had told the step-grandmother. The mother then took K.I. to her 8:00 p.m. doctor's appointment, and then to the step-grandmother's residence.

14

At the step-grandmother's house, K.I. could not bring herself to say her allegations of defendant's abuse out loud to her mother. Instead, K.I. whispered them into the step-grandmother's ear so she could relay them.

The maternal grandfather then took K.I. to the police station, while the mother and step-grandmother confronted defendant about K.I.'s allegations. While wielding a baseball bat, the mother asked him: "Are you f***ing my daughter?" After briefly confronting defendant, the mother stepped outside and step-grandmother asked defendant why K.I. had made such allegations. He responded that "he didn't know . . . that he was always there for her" and that only days before K.I. "had told him that he was a wonderful father. . . ."

<u>The Report to The Police and K.I.'s Forensic Interview</u>

After confronting defendant, the mother and step-grandmother headed to the local police station. They spoke with a police captain about the allegations. He in turn contacted Detective Brad Waudby of the Bergen County Prosecutor's Office, Special Victims Unit, to conduct a forensic interview of K.I.

At trial Detective Waudby testified that, as noted in his report, his interview of K.I. began at 1:40 a.m. A caseworker from the Division of Child

Protection and Permanency[6] appeared at the office with K.I., the mother, and the step-grandmother. The Division worker watched the interview from an adjacent room.

After interviewing K.I., Detective Waudby and other officers went to the family residence. The officers noticed that, although all of the lights were on, no one was answering, and defendant was not answering his cellular phone. They peered inside and saw defendant lying motionless on the bathroom floor. The officers forcibly entered, and provided lifesaving aid to defendant, who was surrounded by empty pill bottles, two knives and a pair of scissors. The officers then secured the home until a search warrant was obtained. They executed the warrant and collected the evidence, including defendant's phone, which was in the bathroom.

The Trial Witnesses

The State's witnesses at trial were K.I., her mother, her step-grandmother, Detective Waudby, and the forensic experts. Defendant did not take the stand in his own defense at trial. He called no witnesses.

---

[6] The record in this case and the pertinent case law refer to both the Division of Child Protection and Permanency ("DCPP") as well as its predecessor organization, the Division of Youth and Family Services ("DYFS"). Accordingly, this opinion refers to both of these organizations, collectively, as the "Division" for the purpose of continuity.

In closing argument, defense counsel extensively questioned the credibility of K.I.'s accusations and her trial testimony. She argued that K.I.'s accusations were contrived, and that her narrative was replete with inconsistencies. Counsel argued that any sexual touching that had occurred was only by K.I.'s biological father, as K.I. had asserted to defendant. Counsel further argued that the photos and text messages, while seemingly alarming, were not conclusive proof beyond a reasonable doubt that defendant had actually engaged in any sexual conduct with K.I.

The Jury Verdict

Before charging the jury, the trial judge dismissed counts five and nine due to timing issues. As part of the charge, the judge instructed the jurors concerning the May 15, 2014 effective date of the Lunsford Act. Specifically, the judge told the jurors that if they were to find defendant guilty of counts one, two, or three, then they had to answer a second query, as to those counts—i.e., "[D]id any act of sexual penetration occur after May 15, 2014?" The judge further instructed that counts four, six, seven, eight, and ten did not concern that secondary question of timing.

During deliberations, the jury asked the court about the significance of the date of May 15, 2014. The court instructed the jury that it was "simply a

question of fact that must be decided by the jury.  You must not speculate as to the reason or reasons you have been asked to make that determination . . . ." However, in giving this guidance to the jury, the court accidently stated May 15, "2015" rather than "2014."  Nonetheless, the verdict form correctly used the 2014 date.

The jury returned a verdict, finding defendant guilty of all of the non-dismissed counts.  The jury answered in the affirmative, both on the verdict sheet and in open court, that wrongful acts occurred "after May 15th, 2014" as to counts one, two, and three.

Several months later, the court imposed the fifty-year NERA sentence we previously noted in our introduction.

## II.

Defendant raises the following points on appeal in his brief:

POINT I

THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION FOR A MISTRIAL WHEN THE STATE DISCLOSED EXCULPATORY EVIDENCE IN THE MIDDLE OF TRIAL.

A.    INTRODUCTION

B.    THE    FAILURE    TO    DISCLOSE EXCULPATORY EVIDENCE IS A BRADY VIOLATION.

18

1. THE REPORT IS EXCULPATORY.

2. THE PROSECUTOR HAD CONSTRUCTIVE KNOWLEDGE OF THE EXISTENCE OF THE REPORT.

3. THE WITHHELD EVIDENCE IS MATERIAL.

C. THE FAILURE TO DISCLOSE THE REPORT VIOLATED OUR DISCOVERY RULES.

D. THE STATE'S FAILURE TO DISCLOSE THE REPORT DEPRIVED [DEFENDANT] OF HIS RIGHT TO A FAIR TRIAL. A MISTRIAL WAS THE ONLY APPROPRIATE REMEDY.

POINT II

THE IMPROPER ADMISSION OF FRESH COMPLAINT TESTIMONY, HEARSAY, AND OPINIONS ON THE ULTIMATE ISSUE AND K.I.'S CREDIBILITY REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS.

A. THE FRESH COMPLAINT TESTIMONY WAS INADMISSIBLE BECAUSE THE DISCLOSURES WERE NOT SPONTANEOUS.

B. INADMISSIBLE ADDITIONAL HEARSAY STATEMENTS IMPROPERLY BOLSTERED K.I.'S ACCOUNT.

C. OPINION TESTIMONY ABOUT THE ULTIMATE ISSUE AND K.I.'S CREDIBILITY WAS INADMISSIBLE.

D. THESE ERRORS WERE HIGHLY PREJUDICIAL AND REQUIRE REVERSAL.

POINT III

THE JURY INSTRUCTIONS AND VERDICT SHEET FAILED TO ENSURE THAT THE CONDUCT IN EACH OF THE AGGRAVATED SEXUAL ASSAULT CHARGES OCCURRED AFTER THE EFFECTIVE DATE OF THE JESSICA LUNSFORD ACT. THE SENTENCES ON THESE COUNTS MUST BE VACATED AND REMANDED FOR RESENTENCING IN THE ORDINARY FIRST-DEGREE RANGE.

We address these arguments, none of which require reversal, in turn.

A.

The primary issue in this appeal concerns the prosecution's non-disclosure of a report prepared by a physician at the Audrey Hepburn Children's House medical facility ("AHCH"), who examined K.I. within two days after she reported her allegations of sexual abuse to the police. The existence of this medical report apparently did not become clear until during defense counsel's mid-trial cross examination of K.I., in which counsel asked her about a text message she had sent to her grandmother on September 24, 2014.

The text message was duly supplied by the prosecution to defense counsel during pretrial discovery, after it was uncovered in the forensic review of the contents of K.I.'s cell phone. In pertinent part, the text message read: "[S]he told me that I am a verjin [sic][(virgin)]." Evidently, the text message itself[7] does not explicitly identify the "she" in this sentence, although the context indicates that K.I. was referring to a female physician who had recently examined her.

The question posed to K.I. by defense counsel was:

> Isn't it true that after you gave a statement to Detective Brad Waudby saying you engaged in sexual intercourse with a grown man on more than one occasion that <u>you text messaged with your grandmother that a medical exam had found you to be a virgin</u>?
>
> [(Emphasis added).]

After a prompt objection by the State, a sidebar was held, and the jury was asked to exit the courtroom. During the sidebar, K.I. testified that she went to "that doctor thing" and "they checked like inside of me I guess and she had told me just because all of this happened I'm still a virgin, so that's what I went by."

---

[7] Our record does not contain a screenshot or printout of the text message, so we abide by the contents quoted from it in the transcripts and appendices.

A-3031-18

Having been provided with this additional background, the trial judge sustained the State's objection to the query of K.I. on hearsay grounds. The judge noted that defense counsel was "asking her to repeat what the doctor said for the truth of the matter asserted that she's a virgin. . . . And you're arguing that physiologically she was a virgin . . . ." Further, the judge observed, "it's not at all clear exactly what it is that the doctor was telling her"— i.e., whether she was "physically" still a virgin or, alternatively, that she was still a virgin because the conduct was "non-consensual." Accordingly, the objection was sustained, whereupon defense counsel preserved the right to call the physician as a rebuttal witness.

The defense resumed questioning of K.I. then revealed that K.I. had a doctor's appointment at AHCH on September 24, 2014. No other details about the appointment were divulged at that point. Defense counsel then sought an order from the court to obtain the records from the AHCH medical facility.

Later that day at trial, Detective Waudby testified on cross examination that, although he did not recall authorizing or requiring K.I. to be sent to the AHCH, he was aware that she had gone to the facility. Given the detective's knowledge of the medical appointment, defense counsel argued it was likely to have been part of the State's investigation.

<u>The AHCH Medical Report</u>

On October 4, 2018, the assistant prosecutor produced a copy of the AHCH medical report to defense counsel and the court during a break in the proceedings. The prosecutor apparently obtained the report from an unidentified billing analyst.[8]

The report, entitled "Medical Evaluation," was dated September 24, 2014. It consisted of six typewritten pages. The report was authored by Paulett Diah, M.D., FAAP, a child abuse pediatrician with AHCH. The report noted that it was based on an examination of K.I. that took place on that same date of September 24.

At its outset, the report stated that K.I. was a twelve-year-old female who came to the AHCH "for an evaluation of possible sexual abuse." The report said K.I. had been "referred by the Bergen County local office of the [Division] caseworker." The report further indicated K.I. had been accompanied to AHCH by the caseworker, K.I.'s mother, and her maternal grandmother. In addition to the physical examination of K.I., additional information in the report had been

---

[8] Although a copy of the report was not provided in the appendices on appeal, counsel supplied a sealed copy of it to us at our request before oral argument.

provided by the Division, separate interviews of the mother and grandmother, and a medical history taken from K.I.

By way of background, the AHCH report stated that "the concern for abuse arose when [K.I.] disclosed sexual contact involving her biological mother's fiancé . . . ." The report noted that the local police department, the Division, and the County Prosecutor's Office had all been contacted about the child's allegations.

The report further indicated that K.I. had been interviewed by the County Prosecutor's Office. During that interview, K.I. reported that, on multiple occasions, her mother's fiancé had engaged in "digital/vaginal penetration, penile/vaginal penetration, and oral/vaginal contact" with her. In addition, the report noted K.I. had alleged her biological father had "touched her breast and vagina over her clothing," years earlier when she was about six or seven years old.

The report stated the doctor had "explained to [K.I.] the reason for her examination was for diagnosis and treatment purposes; to ensure that her body was healthy and clean." During the doctor's interview of K.I., she repeated her allegation that her mother's fiancé had touched her vagina with his penis and his mouth, and that sometimes he would penetrate her.

The report included a detailed description of a genitourinary and anal examination of K.I. Among other things, it noted that K.I. was "unable to tolerate the use of a speculum." No hematomas, scars, lesions, lacerations, bruises, rashes, hypopigmentation, erythema, or ecchymoses were apparent.

On the whole, the report described the findings repeatedly as "a normal examination." It expressly concluded that "[t]he result of this examination neither confirms nor denies the possibility of sexual abuse."

In explaining why vaginal penetration could not be physically confirmed or ruled out, the report noted that K.I. was pubertal at the time. It elaborated that, at puberty, "estrogen effects on the genital tissues (which includes the hymen) result in tissue that is thickened, lubricated and elastic. These characteristics reduce the likelihood of injury from penetrating trauma." Hence, "a normal examination is not unusual in this setting." The report added that "superficial injury such as bruises or abrasions to the genitalia could have occurred at the time of the contact that may have now healed without residua."

The report recommended, among other things, that the DCPP should ensure that K.I. is "in a safe and nurturing environment," that K.I. should be "referred for a psychosocial evaluation to assess any emotional trauma" she may have experienced, that lab tests should be monitored for any abnormal results,

A-3031-18

and that K.I. should have no contact with the fiancé or with her biological father "until the authorities have completed their investigation."

Notably, the report contains no indication that it was transmitted contemporaneously to the Prosecutor's Office. In this regard, the assistant prosecutor represented to the trial judge on the record, as an officer of the court, that "the State was not aware [of the report] until it came out . . . during the trial that [K.I.] had gone to the [AHCH]." Consistent with that representation, and the absence of any other evidence showing otherwise, the judge made a factual finding that neither the State nor defense counsel was aware of the September 24 medical evaluation at AHCH until "everybody learned about it for the first time during cross-examination of the victim."

<u>Arguments Concerning the Report's Non-Disclosure</u>

After an in camera review of the report, and upon motion of defense counsel, the trial judge provided defense counsel with a short recess to research legal arguments concerning the report's non-disclosure, and to subpoena the doctor for appearance at trial in the upcoming week.

Several days later, defense counsel filed a letter brief with the court addressing issues implicated by the recent turnover of the AHCH medical report. The brief stressed the report found that K.I. "had an annular, or intact, hymen,"

26

and also had revealed that she "was unable to tolerate use of the speculum during the exam." Defense counsel argued that these and other specific observations within the report were exculpatory and directly contradicted K.I.'s allegations of multiple instances of full vaginal intercourse with defendant.

Defense counsel also advised the judge she had served a subpoena for Dr. Diah, but learned that the doctor was out of the country and could not testify before October 15. Defense counsel accordingly requested a continuance, which the court granted.

Defendant's Mistrial Motion

Thereafter, on October 15, defense counsel moved for a mistrial based upon learning that Dr. Diah had a new reason for being unavailable to testify, laryngitis. Defense counsel further contended the State's failure to produce the medical report in discovery was a Brady violation, and that AHCH should be regarded, for purposes of Brady and discovery obligations, as an agent of the Prosecutor's Office. The prosecutor vigorously opposed these contentions.

The judge denied the motion for mistrial. He determined, as we noted before, that neither party had been aware of the existence of the medical report, and both learned about it for the first time as a result of the cross-examination of K.I. at trial. The judge also reasoned that, consistent with N.J.S.A. 9:6-8.10a

and State v. Cusick, 219 N.J. Super. 452 (App. Div. 1987), the Division is not an agent of the Prosecutor's Office.

The judge faulted defense counsel for not herself taking the initiative before trial to pursue whether a medical examination of K.I. had been conducted and, if so, to take steps to obtain any report of that examination. The judge specifically found that the "failure to explore this issue and obtain the records at issue fall[s] squarely at the feet of the defense." In this regard, the judge noted the defense had received in discovery K.I.'s text message stating she had been found to be a "verjin," as well as Detective Waudby's report that "clearly stated" that a Division caseworker was present at the forensic interview. Accordingly, the judge ruled there was a sufficient basis to require defense counsel to have explored the issue or filed a motion to obtain the medical records.

The judge amplified this ruling by observing that he believed "the defense made a strategic decision as a matter of trial tactics to wait until cross-examination to surprise the witness and the State with this text message." "It was plain that the [referenced] doctor's visit related to the allegations of sex abuse . . . but the defense chose not to explore that, instead, saving it for trial. Either way, the failure to obtain these records previously is the fault of the defense exclusively."

The judge further noted that a one-week continuance already had been granted to enable Dr. Diah to testify, but "unfortunately . . . she's too ill to come to court." The judge declined to postpone the trial any further.

In addition, the judge ruled the medical report was inadmissible, and not exculpatory "in the way that defense believes it to be." Paraphrasing the report, the judge stated:

> [N]otes based on the victim's age and her sexual maturity at the time of the alleged incident that the normal examination in this case is not unusual - - in a case like this is not unusual, that there could have been superficial injuries such as bruises or abrasions to the genitalia that could have occurred at the time of the contact and may now have healed without residua, which, again, that could go exactly to the point of bleeding, even though the hymen was intact and the doctor says, again, a normal examination was noted in this case. The result of this examination neither confirms nor denies the possibility of sexual abuse.
>
> [(Emphasis added).]

Given the report's inconclusive content, the judge found that admitting it as a defense exhibit would be more prejudicial than probative because doing so implied "the doctor was telling [K.I.] that her allegations of sexual penetration were not true and that would have been wrong because that's absolutely not what the doctor concludes."

29

As a consequence of these rulings, the AHCH report was not admitted into evidence, and defense counsel was not permitted to delve into it further in her examination of K.I. or the other witnesses.

Arguments on Appeal Concerning the Report

On appeal, defendant contends the trial court erred in several ways concerning this issue. As a starting premise, defendant argues the Prosecutor's Office and the Division are both part of the State, and that in this context the Division functioned as an agent of the State when it referred K.I. for a medical examination at AHCH and accompanied her there. Defendant further maintains that even if the Prosecutor's Office did not possess a copy of the report within its files, it constructively possessed or should have known about the report through the Division. Turning to the content of the report, defendant contends it included relevant information that the State must turn over in discovery pursuant to Rule 3:13-3(b), and, moreover, that at least portions of it contained exculpatory information the State must constitutionally divulge under the Brady doctrine. Defendant further argues the trial court erred in imposing the obligation upon defense counsel, rather than upon the prosecution, to have obtained the report. Because of these prejudicial errors, defendant argues the court should have granted his mistrial motion.

30

Analysis Under Brady and the Discovery Rules

Several legal principles guide our assessment of these issues. For starters, we recognize, as did the trial court, that our reciprocity-based criminal rules of discovery require prosecutors to provide defense counsel before trial with material or information in their possession that is relevant to the case. See R. 3:13-3(b). Such discovery includes material that affects the credibility of a State's witness, such as K.I. here, whose testimony "may be determinative of guilt or innocence." State v. Hernandez, 225 N.J. 451, 462-63 (2016). Additionally, the discovery rules also require the State to provide the results or reports of physical or mental examinations "which are within the possession, custody or control of the prosecutor." R. 3:13-3(b)(1)(C).

The basic precepts of the Brady doctrine are likewise well established. A criminal defendant "has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." State v. Hollander, 201 N.J. Super. 453, 478 (App. Div. 1985) (citing Brady, 373 U.S. at 87). "In order to establish a Brady violation, the defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." State v. Martini, 160 N.J. 248, 268-69 (1999) (citing

31

Moore v. Illinois, 408 U.S. 786, 794-95 (1972)); see also State v. Brown, 236 N.J. 497, 519 (2019).

For the purposes of our analysis, we shall assume, without deciding, that the AHCH medical report contains material information. We also will assume, without deciding, that portions of the report, despite its inconclusive ending, could have been favorable to the defense in impeaching K.I.'s narrative.

The critical flaw in defendant's argument concerns Brady prong one: that the prosecution suppressed evidence it possessed or should have possessed. Defendant essentially treats the Prosecutor's Office and the Division as a monolithic single entity. This overly simplistic characterization of the discrete functions of those different governmental agencies is contrary to the law and was rightfully rejected by the trial judge.

We recognize that under Brady principles, the prosecution is generally obligated to produce any evidence which it possesses, controls, or is constructively aware. State v. Nelson, 155 N.J. 487, 498 (1998). A County Prosecutor is deemed to be constructively aware of evidence possessed or known within the Prosecutor's Office as a whole, because it acts as one entity. Id. at 499 (citing Giglio v. United States, 405 U.S. 150, 154 (1972)). Beyond that, an "individual prosecutor has a duty to learn any favorable evidence known to

others <u>acting on the government's behalf in the case</u>, including the police."

<u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) (emphasis added); <u>see</u> <u>Nelson</u>, 155

N.J. at 498 (adopting the reasoning of <u>Kyles</u>). Conversely, a prosecutor does

not have an obligation to aid defense counsel in obtaining information contained

in the public record that counsel may obtain through their own diligence. <u>State</u>

<u>v. Orlando</u>, 269 N.J. Super. 116, 134 (App. Div. 1993) (citing <u>State v. Engel</u>,

249 N.J. Super. 336, 389 (App. Div. 1991)). Defense counsel "has a duty to

make reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary." <u>State v. Chew</u>, 179 N.J. 186, 217 (2004)

(quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 691 (1984)).

The relevant statute concerning access to confidential Division records,

N.J.S.A. 9:6-8.10a, states in relevant part:

> a. All records of child abuse reports made pursuant to section 3 of P.L.1971, <u>c.</u> 437 (C.9:6-8.10), all information obtained by the Department of Children and Families in investigating such reports including reports received pursuant to section 20 of P.L.1974, <u>c.</u> 119 (C.9:6-8.40), and all reports of findings forwarded to the child abuse registry pursuant to section 4 of P.L.1971, <u>c.</u> 437 (C.9:6-8.11) <u>shall be kept confidential and may be disclosed only under the circumstances expressly authorized under subsections b.</u>, c., d., e., f., and g. herein. The department shall disclose information only as authorized under subsections <u>b.</u>, c., d., e., f., and g. of this section that is <u>relevant to the purpose for which the information is required,</u>

provided, however, that nothing may be disclosed which would likely endanger the life, safety, or physical or emotional well-being of a child or the life or safety of any other person or which may compromise the integrity of a department investigation or a civil or criminal investigation or judicial proceeding. If the department denies access to specific information on this basis, the requesting entity may seek disclosure through the Chancery Division of the Superior Court. This section shall not be construed to prohibit disclosure pursuant to paragraphs (2) and (7) of subsection b. of this section.

Nothing in P.L.1977, c. 102 (C.9:6-8.10a et seq.) shall be construed to permit the disclosure of any information deemed confidential by federal or State law.

b. The department may and upon written request, shall release the records and reports referred to in subsection a., or parts thereof, consistent with the provisions of P.L.1997, c. 175 (C.9:6-8.83 et al.) to:

(1) A public or private child protective agency authorized to investigate a report of child abuse or neglect;

(2) A police or other law enforcement agency investigating a report of child abuse or neglect; . . .

[Id. (emphasis added).]

If the Division denies access, a court order must be sought by the entity seeking

its disclosure.

In discussing the relationship between the Division and law enforcement, the Supreme Court in State v. Buda, 195 N.J. 278 (2008), determined that the Division does not become an extension of law enforcement simply because it was acting pursuant to its reporting requirements as detailed in N.J.S.A. 9:6-8.36(a). Id. at 306-08.

In Buda, Division caseworkers were called in response to a boy who was brought to a hospital emergency room exhibiting signs of abuse. Id. at 286. After finding him severely beaten, the mother of a four-year-old boy rushed him to the emergency room, and with his grandparents present, a Division caseworker interviewed the boy as he sobbed. Id. at 296-97. During the interview, the boy made a statement to the caseworker that implied the defendant had beaten him. At trial, the defendant argued the boy's statement was inadmissible as testimonial hearsay, and thus barred under Crawford v. Washington, 541 U.S. 36 (2004).

The Supreme Court majority in Buda ruled the boy's statement to the Division caseworker was nontestimonial. 195 N.J. at 306. In doing so, the Court explained that that the reporting requirement of N.J.S.A. 9:6-8.36(a) (requiring Division caseworkers to immediately report suspected child abuse or neglect to the county prosecutor), was not on its own sufficient to convert a Division

caseworker from a civil agency employee to an extension of law enforcement. Id. at 306-07.

Citing its earlier opinion in State v. P.Z., 152 N.J. 86, 96-99 (1997), the Court in Buda explained that the Division's stated mission under its statute is to protect and "immediately" safeguard the rights and welfare of children who are in danger of injury or possible death, rather than enforce the criminal laws. 195 N.J. at 306. The Court explicitly rejected the notion that just because the Division, a civil agency, and a County Prosecutor, a law enforcement agency, at times are both investigating or taking actions against a person, they must be considered institutional extensions of one other. The Court explained its "inquiry is informed by the explicit recognition that a [Division] worker acting in a proper civil role does not trigger considerations that are unique to criminal trials, including the Confrontation Clause." Id. at 307 (emphasis added).

The Court did recognize in Buda that exceptions may exist where a law enforcement agency has collaborated with a caseworker to orchestrate a civil interview as a means to gather incriminating evidence for a future prosecution. Id. at 307-08. No such collaboration or use of a case worker as a prosecutor's agent was discerned by the Court majority in Buda.

A-3031-18

Although the dissenting justices in Buda disagreed with the majority's assessment of the situation, the dissent nonetheless recited a high bar for when such collaboration is so extreme as to justify treating a caseworker as an agent of a prosecutor. Specifically, the dissent found such coalescence exists where the functions of the Division and the prosecutor become "inextricably intertwined." Id. at 318 (Albin, J., dissenting). The circumstances in the present case fall short of that mark.

In its earlier opinion in a Fifth Amendment context in P.Z. the Court held that the setting in which a defendant gave incriminating statements to a Division caseworker about acts of child abuse did not amount to a law enforcement officer conducting a custodial interrogation, and thus trigger defendant's rights to a Miranda[9] warning. 152 N.J. at 106. In holding in P.Z. that Division caseworkers generally are not required to give people they interview Miranda warnings, the Court observed that: "The criminal justice system acts separately, but in tandem with the civil system, to investigate and prosecute those who abuse and neglect children." Id. at 100.

Focusing away from these Supreme Court decisions in Buda and P.Z., defendant relies upon this court's earlier opinion in State v. Helewa, 223 N.J.

---

[9] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3031-18

Super. 40 (App. Div. 1988). On the facts in <u>Helewa</u>, we ruled that the particular close working relationship between the Division and the County Prosecutor's Office in that case made the Division caseworker functionally a law enforcement officer when she conducted a custodial interview of the defendant after he had been arrested on allegations of sexual assault of his two minor daughters. 223 N.J. Super. at 42-45. We held that, under the circumstances there, the caseworker was acting as an extension of the government.

The trial judge in the present case was guided in part by <u>Cusick</u>, 219 N.J. Super. 452, in determining the burden was upon defense counsel, not the prosecutor, to seek out and move to obtain the AHCH medical report, based upon the available evidence. In <u>Cusick</u>, the defendant sought reversal of his convictions of various sexual assault offenses against a child. On appeal, he argued in part that his constitutional right to confront witnesses against him was violated when the Division denied him access to certain records. <u>Id.</u> at 455-56. There, defense counsel had subpoenaed records concerning the victim's allegations from both the Division and a children's treatment center. A Deputy Attorney General representing both the Division and the center appeared before the trial court and explained that the subpoena could not be complied with because turning over the records was prohibited by statute. <u>Id.</u> at 456.

Citing Pennsylvania v. Ritchie, 480 U.S. 39 (1987), we observed in Cusick that a criminal defendant's "right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files." 219 N.J. Super. at 462-63. Instead, the Division's confidentiality provisions in Title 9 require judicial review and a court order authorizing release when the Division declines to reveal the confidential records. In Cusick, the trial court reviewed the Division file materials in camera, and identified no pertinent impeachment material that could have been used by the defendant. Cusick, 219 N.J. Super. at 463.

Here, there is no sound basis in the record to treat the Division, let alone the AHCH or Dr. Diah, as an "agent" of the County Prosecutor's Office with respect to the pediatrician's medical examination of K.I. The examination was arranged by the Division, not by the Prosecutor's Office or the police. K.I. and her family members were accompanied to AHCH by the caseworker, without being joined by a police officer or an employee of the Prosecutor's Office.

There is no indication in the report that the doctor's examination was influenced or guided by the prosecutor, or that she performed her role on the prosecutor's "behalf." Kyles, 514 U.S. at 437. The doctor's clinical findings are

described in medical terminology typical of the profession rather than the language of criminal codes or police reports.

There also is no indication in the record that the medical report was supplied to the Prosecutor's Office. The trial judge made a finding of fact that the Prosecutor did not learn of the report until the midst of defense counsel's cross examination of K.I., and we owe that finding deference on appeal. State v. Locurto, 157 N.J. 463, 471-72 (1999).

We concur with the trial judge that defense counsel had a fair opportunity to seek the results of the evaluation herself. The State appropriately and timely supplied the defense in discovery in 2015 with K.I.'s text message about being deemed a "verjin," and did not conceal that potential lead. Yet, perhaps for tactical reasons, defense counsel apparently elected to not pursue the subject until the cross-examination of K.I. in 2016. We do not opine here about whether that was a reasonable tactical decision, as we do not know from the record what were counsel's strategic thought processes. In any event, there was not a failure on the prosecutor's part to honor its obligations under Brady or the discovery rules.

Given the circumstances, the trial judge did not misapply his discretion or the applicable law in ruling that the hearsay medical report, which is replete with

complex expert opinions, was inadmissible. See N.J.R.E. 802 and 808; James v. Ruiz, 440 N.J. Super. 45, 64 (App. Div. 2015). The judge afforded the defense a reasonable interval for a continuance to attempt to have the doctor appear and testify. Unfortunately, the doctor was not available, perhaps in part due to the short notice that could have been avoided by sooner efforts to identify her role as an examiner and secure her testimony. The judge appropriately declined to allow the jurors to speculate about the results of the medical examination or to absorb the doctor's written hearsay opinions without explanatory testimony. All in all, the judge acted fairly and did not abuse his discretion in denying the mistrial application. State v. Winter, 96 N.J. 640, 646-47 (1984).

In reaching these conclusions, we express no opinions about whether it would have been preferable for the Prosecutor's Office to have initiated some inquiry on its own whether K.I. was taken by the Division to the AHCH for a medical examination and, if so, to find out the results of that examination. Perhaps in this case the Prosecutor's Office determined it had plenty of incriminating evidence (including the photos and text messages) so that it was not vital to pursue medical corroboration, or that, based on prior experience, such examinations at the AHCH are frequently, as here, inconclusive. We do

not have enough information to form a judgment about what may have been the actual reasons.

In any event, the record, as it was developed here, is more than sufficient to support the trial judge's assessment that the prosecution did not violate its disclosure obligations under <u>Brady</u> or the discovery rules. Defendant has not proven error that would have had a clear capacity to change the verdict. <u>R.</u> 2:10-1.

## B.

We briefly turn to defendant's contention that the trial court erred in admitting evidence of K.I.'s out-of-court revelations of abuse to her step-grandmother under the "fresh complaint" doctrine. The fresh complaint admissibility analysis was conducted in pretrial proceedings under N.J.R.E. 104 by a different judge than the one who later presided over the trial. We substantially agree with and adopt that first judge's analysis.

We reject defendant's argument that the fresh complaint doctrine disallows such evidence where the victim has made the complaints of wrongdoing in response to yes/no questions by the confidante. Although we expressed concerns about the potentially leading nature of such queries in <u>State v. J.S.</u>, 222 N.J. Super. 247, 253-54 (App. Div. 1988), the Supreme Court

thereafter in <u>State v. Bethune</u>, 121 N.J. 137, 145-48 (1990), adopted a less categorical and more flexible approach. In <u>Bethune</u>, the Court reposed in the trial court's substantial discretion to ascertain from the circumstances whether the communication between the child and the confidante was unduly coercive or suggestive. <u>Ibid.</u>

Here, the step-grandmother's manner of discussing this difficult and emotional topic with K.I., particularly after hearing that defendant had told the child he wanted to kill himself, was not excessively suggestive or graphic. The child herself testified at trial, in much greater and more graphic detail, about the sexual acts. Given that detailed testimony, any claimed error in the admission of her out-of-court fresh complaint accounts was harmless. <u>State v. Frost</u>, 242 N.J. Super. 601, 618 (App. Div. 1990). Moreover, the court issued appropriate instructions to the jury about the limited probative use of fresh complaint evidence. We discern no reversible error.

As a somewhat related argument, defendant contends that K.I., Detective Waudby, and several of K.I.'s relatives improperly conveyed various out-of-court statements during the course of their testimony. We are unpersuaded these assorted claims of hearsay violations require a new trial. Several of the statements encompass defendant's own out-of-court assertions, which are

43

plainly admissible under the hearsay exception for statements by a party-opponent, N.J.R.E. 803(b)(1). Other statements did not violate the hearsay rule to the extent they were non-assertive. See N.J.R.E. 801(c); State v. Long, 173 N.J. 138, 152 (2002). The remaining passages of hearsay singled out by defendant on appeal do not appear to be clearly capable of producing an unjust result. R. 2:10-2 (plain error).

We likewise are unimpressed by defendant's contention that testimony from K.I's mother, step-grandmother, and Detective Waudby intolerably transgressed the lay opinion boundaries of N.J.R.E. 701. To the extent that defendant failed to object to some of those statements, we discern no plain error in their admission. State v. Macon, 57 N.J. 325, 335-36 (1971); see State v. Prall, 231 N.J. 567, 581 (2018) (citing Macon). In the instances where such an objection was interposed, the opinions either appear to have had an appropriate foundation under Rule 701, or, if not, were not so prejudicial in nature to eclipse the abundant other proofs of defendant's guilt.

## C.

Finally, little needs to be said about defendant's claim that the jury's announced verdict and the verdict form did not sufficiently establish that he was guilty of committing one or more of the charged acts on counts one, two, and

three after the May 15, 2014 effective date of the Jessica Lunsford Act, N.J.S.A. 2C:14-2. The jurors were specifically instructed by the court about the need for the State to prove such offenses after that date, and the verdict form (which defense counsel approved) adequately delineated the time frame. The jurors were polled on the date question, and unanimously confirmed their determination. We reject defendant's entirely theoretical speculation that, despite these measures, some jurors might have found that defendant's acts of penetration all preceded May 15, 2014. The verdict was sound, and the court's imposition of the enhanced mandatory minimum sentence called for by the Jessica Lunsford statute unassailable.

To the extent we have not commented about them, all other points raised on appeal lack sufficient merit to be worthy of discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

45